AMERICAN BELL TEL. CO. v. NATIONAL TEL. MFG. CO. et al.

SAME v. CENTURY TEL. CO. et al.

(Circuit Court, D. Massachusetts. June 24, 1901.)

Nos. 653, 655.

1. PATENTS—ANTICIPATION—TELEPHONES.
    The Berliner patent, No. 463,569, for a combined telegraph and telephone, in so far as it claims broadly the method of producing in a circuit electrical undulations by variations of pressure between opposing electrodes in constant contact, was anticipated by the prior Bell liquid transmitter; and, if invention be conceded to the application of such method by substituting a solid metal electrode for the mercury electrode of Bell, it was anticipated by the inventions of Edison.

2. SAME.
    Such patent is void for the further reasons that its claims are so broad in their language as to include every transmitter of the general

class, of which Bell was the first inventor, and also because the in-vention claimed is not the one described in the application, but was expressly disclaimed. The patent was issued in 1891 on an application filed in 1877, which was subsequently changed by purported amend-ments to one for an entirely different invention which had been antici-pated and perfected in the meantime by other inventors.

3. SAME—AMENDMENT OF APPLICATION—SCOPE OF RIGHT.

The right to amend or to complete an application, under Rev. St. § 4894, does not give the right to transform the application by amend-ment into one for a different invention; and where the essence of the invention is not in the apparatus shown, but in its mode of operation, a new principle or method of operation cannot be introduced by amend-ment, and be sustained on the original application, to interfere with other inventors who have entered the field in the meantime, although the apparatus itself is left unchanged.

4. SAME—EFFECT OF AMENDMENT.

Berliner's application on which his patent No. 463,569 was issued de-scribed instruments of which the applicant stated that they would reproduce "any musical sound uttered in the neighborhood of either of them; but for the reproduction of special sound, such as speech, they are not adapted." The apparatus itself was old, and the only novelty claimed was in applying it to the use specified. *Held*, that the appli-cant could not, by an amendment striking out the disclaimer as to the transmission of speech by means of such apparatus, transform the ap-plication into one for a speech-transmitting telephone, which was an invention he had not in fact made at the date of the application.

5. SAME—MISTAKE IN APPLICATION.

Evidence considered, and *held* insufficient to sustain the burden of proof resting upon complainant to establish the fact that statements in the Berliner application on which patent No. 463,569 was issued were made through a clerical mistake, which authorized their being stricken out by an amendment.

6. SAME—INVENTION—EVIDENCE CONSIDERED.

Evidence *held* insufficient to establish that Berliner had in fact made the invention of a telephone for transmitting speech claimed in patent No. 463,569 at the date of the filing of the application, which expressly disclaimed such invention.

7. SAME—EXPERIMENTS BY EXPERTS.

That the apparatus of a patent is capable of being used as a speak-ing telephone, as shown by experiments made by experts, is not suffi-cient to prove that the patentee had succeeded in using it successfully for that purpose at the time of his application, so as to entitle him to claim such use as his discovery, where it is disclaimed in the applica-tion, or to show that the disclaimer was made through mistake; and, to give such experiments evidential value, it must be shown that they were made under the same or similar conditions as those existing in experiments conducted by the patentee.

8. SAME—CAVEAT AS EVIDENCE.

A caveat made without experimental knowledge, and the statements in which are merely of possibilities, and are not based upon scientific or experimental knowledge, does not constitute a reduction to practice which will support a claim to invention.

9. SAME—DOUBLE PATENTING.

The Berliner patent, No. 463,569, claim 2, for a telephone transmitter, was anticipated by patent No. 233,969 to the same patentee, issued on a division of the same application, and which, in claim 4, covers a sys-tem consisting of the same transmitter in connection with a receiver, but in which such transmitter performs the same function as with any other receiver, and is applied to its appropriate and intended use; a receiver of some kind being essential to its operation.

In Equity.

109 F.—62

Fish, Richardson & Storrow, for complainant.

Edward P. Payson, for defendants National Tel. Mfg. Co. and others.

James E. Maynadier, for defendants Century Tel. Co. and others.

Robert S. Taylor, for defendants in the interest of Williams Electric Mfg. Co.

(February 27, 1901.)

BROWN, District Judge. The decree in these cases must be for the defendants.

## A.

I find the Berliner patent invalid:

1. Because, at the date of the application, June 4, 1877, Berliner had not made the invention covered by the patent issued to the American Bell Telephone Company on November 17, 1891. Berliner's application says, of the instruments shown in the drawing of the patent: "These simple instruments will reproduce any musical sound uttered in the neighborhood of one of them; but for the reproduction of special sound, such as speech, they are not adapted." A clear statement of the reasons is given, the statement is repeated, and it is said also of sound waves: "Nothing of the nature of each wave and the shape of their curves is recorded." He states that he accomplishes this by apparatus operating to make and break the circuit. His model and drawings, as well as the text of his application, show that he intended to transmit speech by the erroneous method of interrupting the contact of electrodes and breaking the current. This document stands, in this case, as evidence on the question of invention, exactly as it was written. It is conclusive evidence that Berliner had not invented, and did not intend to apply for a patent for, a constant-contact speech transmitter. The complainant's attempt to show that statements contained in this document were inserted through the mistake of a solicitor's clerk is a failure. I am convinced that this is not true. I find, as a matter of fact, that Berliner did not, before June 4, 1877, succeed in transmitting speech, but, on the contrary, was convinced by his experiments that speech could not be transmitted by the apparatus of the patent in suit. I find also that he did not at that date intend to describe or claim the apparatus as a speech transmitter. In view of the original application, the complainant's case cannot be established without proof of successful experiments by Berliner. The invention set forth in the patent lay in experiment. In inventions of this class, the true date of conception is the date at which the experiment succeeds. The complainant concedes that Berliner did not make new apparatus, but reproduced substantially the old Reiss apparatus. Proof that the Reiss apparatus, or Berliner's apparatus, or the Morse key, is operative in the hands of experts, does not establish invention by Berliner. He is not entitled, as an inventor of apparatus, to claim whatever may be found to be within its capacity, because his sole claim to invention is based upon an alleged discovery of a new capacity in old apparatus. If he did not discover this, nothing new remains that he did discover or invent. He did not "embody" an invention in appa-

ratus unless he succeeded in making the old apparatus perform Bell's process upon the current. The complainant has not proved that Berliner's apparatus will transmit speech under the conditions existing at Berliner's experiments. Berliner's caveat of April 14, 1877, does not establish invention, and does not count as a reduction to practice. It proves a project. Later caveats, the application, the record in the patent office, and other evidence show the failure and abandonment of this project. Complainant's experts agree that what was stated in Berliner's caveat of April 14, 1877, would at that date have been deemed by scientific men impracticable, and that it could not have been predicted upon scientific or theoretical grounds. In the Telephone Cases, 126 U. S. 545, 8 Sup. Ct. 778, 31 L. Ed. 863, the supreme court said of an experimenter: "It was not until after Bell's success that he found out how to use the Reiss instrument so as to make it transmit speech. Bell taught him what to do to accomplish that purpose." Also it was said: "It was left for Bell to discover that the failure [of Reiss] was due not to workmanship, but to the principle which was adopted as the basis of what had to be done." If it was obvious to Berliner, or to persons skilled in the art, upon a reading of Bell's patent, that the Reiss apparatus could perform Bell's process, then the case fails as to invention. If what Berliner wrote in his caveat was obvious without experiment, Bell "taught him what to do to accomplish that purpose." The complainant avoids the defendants' point that Berliner made no invention in using Reiss' old machine by Bell's old method by evidence that it was not known that such changes as could be effected between solid electrodes would vary the current sufficiently or in the desired proportion. This required discovery through experiment. The complainant's contention that its case can be established irrespective of experimental results is therefore untenable. To claim that Berliner made an invention because scientific men would have deemed it impracticable to practice Bell's method with solid electrodes, and because it was wholly unknown that the current could thus be made to vary in the proper proportions, and also in the same case to claim that Berliner, in writing his caveat, must, as an inventor, have perceived that his project was necessarily true, and that experimental verification was not necessary, is highly inconsistent. The complainant's case as to invention must rest upon the ground that what was stated in the caveat was not obviously and necessarily true, that experimental verification was necessary, and that Berliner did verify his project by successful experiment, resulting in discovery of facts before unknown. The proof is strong to the contrary. It is largely documentary and contemporaneous, and is not met by the inconclusive, argumentative, and wholly unsupported oral testimony of Berliner, given years after the filing of the application. The absence of any corroboration from the numerous persons who are said to have witnessed Berliner's experiments, and the failure to account for the nonproduction of witnesses, is a strong fact against the complainant.

2. Because the invention described in the patent is radically different from the invention described in the application. A comparison

of the two documents leaves no doubt on this question. The application expressly disclaims speech transmission by the instrument of the patent, and claims as a speech transmitter a double-pin instrument, operating to make and break the contact of electrodes. The patent calls for constant contact of electrodes and an unbroken current; the application, for an interrupted contact and a broken current. The decision of the supreme court in the Telephone Cases shows the substantial difference between these methods of operating on the electric current. The original application, by changes purporting to be amendments, has been completely transformed into an application for a distinct invention. This transformation is of the most remarkable character, and was made after Edison's carbon constant-contact speech transmitter was invented and described in a printed publication. Such amendment is illegal, even if Berliner had made the invention before June 4, 1877. The amendments made prior to 1880 cannot support the patent, as they did not introduce constant contact of electrodes. If they did, they are illegal, as introducing a different invention. A constant-contact speech transmitter is first sufficiently described and claimed, if at all, in the rewritten specification of 1880. The invention had then been in public use for more than two years, i. e. from June, 1878. There is no legal application to support this patent.

3. Because the invention was previously patented by Berliner. Berliner, in 1880, took out a patent which covered the speech transmitter of the patent in suit, applied to its appropriate use in a "system," i. e. with a receiver. Claim 4 of this patent is not in terms or in fact for a combination, since the transmitter is a system part or relative part, and it does not constitute a "combination," in the sense in which that term is used in patent law, to put a system part into a system for which it is designed; to put a relative instrument into its intended relation, without invention in so doing. This is but application to appropriate use. The effect of claim 4 of the 1880 patent was to give a monopoly of this instrument, applied to its appropriate use, without additional invention in making this application. By granting the patent of 1880, the commissioner exhausted his power to issue a second patent, whereby the patentee could control all use of this instrument as a transmitter. Having been protected for 17 years in the use of this transmitter with one receiver, Berliner was not entitled to further protection for use with any and all receivers. I agree with the conclusion of Judge Carpenter on this point in U. S. v. American Bell Telephone Co. (C. C.) 65 Fed. 86.

4. Because Edison was the prior inventor. Berliner's amendments must bear date as of the date of filing. August 8, 1877, is the earliest date of amendment affecting this controversy. Berliner's amended application is anticipated by Edison's application of July 20, 1877, and by the Philadelphia Press article of July 9, 1877. The burden of proof is upon the complainants to anticipate Edison. They cannot sustain it. Assuming Berliner's application to date as of June 4, 1877, he is anticipated by Edison's application of April 27, 1877. One form of apparatus therein described is substantially the Berliner apparatus, operating in the same way.

## B.

Claims 1 and 2 in suit are invalid because anticipated by Bell's patent and Bell's liquid transmitter. Bell was a prior inventor of a transmitter that operated upon a battery current by changes of an electrical contact. Its mode of operation was by constant, but variable, contact of electrodes. Variable pressure upon the diaphragm and variable pressure of one electrode upon another are invariable and necessary accompaniments of its operation. As Bell's liquid transmitter has two aspects or features invariably accompanying each other, and novel over the magneto instrument, either will serve for a name or description that will distinguish the liquid transmitter from the magneto transmitter. We may call the Bell liquid transmitter a "constant but variable contact transmitter," or a "variable pressure transmitter," or we may say that the mode of operation is by "variable contact" or by "variable pressure." These names are interchangeable. They are of no value, however, in pointing out differences between the different types of constant-contact transmitters before us in this case, because they name only features common to all, and do not state a distinctive difference. The claims of the patent cover all transmitters having variable pressure between electrodes. They therefore seek to appropriate Bell's invention under a new form of words. The claims, when read according to their natural signification, undoubtedly include Bell's liquid transmitter, and are invalid for excessive breadth. They cannot be saved by making an arbitrary exception of Bell's liquid transmitter as specific apparatus, because that would still leave Berliner claiming all other transmitters possessing Bell's features of variable contact and variable pressure between electrodes, which are now public property. This is not a mere verbal criticism of the claims; for experts and counsel, by the use of language similar to that of the claims, credit to Berliner, and seek to cover by his patent, what was in fact the invention of Bell. Attributing to Berliner the invention of a mode of operation or process, to wit, "variable pressure," and apparatus characterized by this mode of operation, they explain its novelty by ignoring Bell's liquid transmitter, and by reverting to Reiss. They thus show a novelty over Reiss, to wit, the "variable pressure operation," as distinguished from the make and break operation. In other words, they claim for Berliner a new "electrical mode of operation," which is in fact Bell's, and also a new mode of treating the circuit, i. e. varying without interrupting it, which is also Bell's. This is accomplished with some degree of plausibility by using a new term, i. e. "variable pressure operation," to signify an old thing, i. e. the varying contact operation. When we start from Bell, as we must, in the search for novelty, and not from Reiss, as the complainant does, we find that the language of the claims, read in the light of the prior art, shows nothing novel over Bell.

## C.

Claims 1 and 2 are anticipated by Edison. These claims are of excessive breadth, for the further reason that they include various devices of Edison, which, like Bell's liquid transmitter, employ a

battery current, and a variable contact of electrodes, and variable pressure. Edison's devices of February 9 and April 1, 1877, anticipate these claims. The complainant asserts that these transmitters differ essentially from Berliner's, and therefore admits that Berliner has no right to include them; but nevertheless the broad, general language of the claims covers them. A limitation to solid electrodes does not save the claims. By claiming "variable pressure" of electrodes as a method or principle, the complainant has attempted to monopolize a feature common to many constant-contact transmitters, and thus to discourage and hamper further invention in the same line of industry. The claims are plain. They cover all forms of variable contact transmitters before us in this case. I am of the opinion that they are void, and cannot be saved by the specification. These claims are now said by counsel to express accurately and happily Berliner's real invention. They do, in fact, represent the substance of the complainant's main argument. The complainant also claims for Berliner invention in the use of the minute force of a sound wave to vary pressure between electrodes, and invention in the discovery that accompanying variations of pressure were corresponding variations of current. This is in the Bell patent as well as in Bell's liquid transmitter and in various devices of Edison. The complainant is certainly not entitled to claim as a novelty the utilization of minute forces, after the Bell patent and Bell's liquid transmitter, and in view of the contention that Edison intended to compress a mass of plumbago thereby. Berliner borrowed his apparatus for "transmitting the impression of agitated air" bodily from Bell's second patent. As variations of current are proportional to variations of pressure at the diaphragm in all transmitters, it is not remarkable that they are also proportional to variations of pressure at the place in the circuit where the change of contact occurs, and where the force exerted upon the diaphragm is expended upon the circuit. It is the principle of Bell's magneto instrument and of his variable contact transmitter that the current shall vary proportionally to the pressure at the diaphragm. It is a principle of the variable resistance method that the resistance shall vary by pressure exerted upon the circuit, and proportionally thereto. In the liquid transmitter is the principle that the current shall vary proportionally to the pressure at the diaphragm, and also proportionally to the pressure between electrodes, and also that, as pressure on the diaphragm and between electrodes is weakened, the current becomes less intense; as it is strengthened, more intense. This was also in Edison, before Berliner. We are not dealing with claims carelessly drawn by an ignorant inventor, but with the phraseology of experts framed more than two years after public use of the invention, with the intention of asserting that Berliner was the originator of very broad principles that control the practical art of telephony. Those principles are Bell's.

### D.

Claim 1 for a method is invalid. The patent discloses nothing patentable as an art, method, or mode of operation. The method

is "by causing the sound waves to vary the pressure," "so as to strengthen and weaken the contact." Apparatus is required, i. e. electrodes in constant contact. The "causing" is accomplished by placing the apparatus where there are sound waves. This is not patentable as an art or method. Producing sound waves is no part of the method whereby existing sound waves are caused to vary pressure. The patent covers no art or skill required in keeping the electrodes in constant contact. The patent shows a screw by which this can be done. It appears that an equivalent means is in using a low tone of voice to avoid destroying the contact. This is not an art or method, or, if so, not that covered by this patent. If invention is required to keep the electrodes in constant contact, or to put transition resistance into the circuit, the patent is bad, since it leaves this to be found out by experiment. Producing sound waves appropriate to particular forms of apparatus is not the method whereby existing sound waves are caused to vary pressure between electrodes, and should not be confused therewith. The force utilized and the process performed upon the current, i. e. causing undulations of a particular form, are both in Bell. The method of claim 1 is practiced solely by a machine, and is merely the modus operandi of a machine, and is not patentable as an abstraction apart from a machine. If there was involved a discovery of the value of minute variations of contact in changing a current, this led merely to the construction of apparatus, and not to a new art or method. Moreover, claim 1 is invalid by two years' public use.

E.

Assuming that the specification discloses an invention, and that by limitation claim 2 can be saved, the patent nevertheless is limited to the structure therein described, and so limited that the defendants do not infringe. The patent does not disclose or suggest any material other than metal for the second electrode. Berliner's experiments were solely with metallic electrodes. He did not, as a matter of fact, make any investigations in consequence of which he was entitled to assert a general truth concerning all solid electrodes. It is not proven that metallic electrodes are generally suitable for practical use in a speech transmitter. To save the patent by limiting it to the apparatus there shown would not avail the complainant. The defendants' transmitters having carbon electrodes are, as apparatus, distinct inventions. The carbon electrode was the invention of Edison; it was not an equivalent for the metal electrode of Berliner. The complainant seeks to hold the defendants' transmitters as infringements by comparing them as embodiments of a principle, art, process, or method discovered or invented by Berliner. I am of the opinion that it has not succeeded. The variable pressure principle affords no basis for a distinction between Berliner's device and three variable pressure constant-contact transmitters which preceded it, two having solid electrodes. This generalization, which covers the defendants, also covers so much of the prior art that the complainant is anticipated if it stands upon it. Distinctions between changes in inti-

macy of contact and of area of contact, and changes of mass or molecular condition following pressure of electrodes in contact, are distinctions as to apparatus, not as to principles, and these distinctions are not satisfactorily established. The transmitters of Bell, Edison, and Berliner agree in this: that each is capable of producing electrical undulations similar in form to sound waves and of transmitting speech. Upon the evidence as it stands in this case, this must be assigned to the general feature which is common to all variations of physical contact. I do not think that anything more than distinctions in the kinds of contact has been shown. A patentee is entitled to take the position that, as an experimenter, he produced practical apparatus, or found that old apparatus could be applied to a novel and nonanalogous use. He may stand on his legal right to refuse to enter upon a discussion of the laws of nature or scientific principles involved, and say, "I claim, as a novel and useful thing, my apparatus. This apparatus exhibits my invention, and proves by example its character." The complainant does not submit to have the invention compared with others as to its practical efficiency in the practical art. It undertakes to claim something very much broader than what is exhibited in the apparatus of the patent. The patentee first takes the position that Berliner said, "I have found that, when electrodes are pressed together more or less by the minute pressure of sound waves, the current increases and decreases proportionally;" but two inventors before Berliner found this out. The patentee then says, "I have found that this is the case with two solid electrodes;" but Edison had found this out before. The complainant replies: "But these inventions change the area of contact, and the mass or molecular condition of the second electrode, which is a radically different method from mine, though probably these changes may occur in my transmitter to some extent. I do not know what is the reason of the change of current in my transmitter." The defendants say that all these instruments agree broadly in this: that as changes of physical contact occur changes of current occur. They all produce electrical undulations similar in form to sound waves. They are therefore members of a class, to be compared merely in respect to the manner in which they respectively perform their functions, and according to what they have contributed to the practical art. The complainant makes a final attempt to lift Berliner's invention out of a subordinate position in the class of constant-contact transmitters, and attempts to give an account of the reason for the change of current in Berliner's instrument, saying Berliner's instrument operates by varying transition resistance (that is, the resistance of imperfect contact, which varies as the contact is weakened and strengthened); but this does not appear to be anything more than singling out for description another aspect of what occurs in all cases when a contact changes. The resistance is due to discontinuity. To change the discontinuity, we must change the continuity. Changing the continuity is merely changing the contact. This is a novel form of words, but it does not distinguish Berliner's transmitter broadly from other transmitters. But it is said the

other transmitters show but little or no trace of microphonic action when they transmit speech.

The final distinction is as to the character of the tone produced by the different transmitters. Testing the merit of Berliner's invention by his advance in the art, by the advance made with metallic electrodes, we see that it is very slight. Metallic electrodes have never come into commercial use. The Berliner instrument made no advance upon Bell's magneto instrument. It is not proven to be superior to the instruments of Edison having solid electrodes. The Berliner patent, or Berliner's caveat, does not contain any suggestion of the thought that was the basis of the invention of the carbon transmitter. Edison preceded Berliner in the transmission of speech. The carbon transmitter was an experimental invention of a very high order of merit. It would be contrary to common sense to permit this invention to be subordinated to the invention of Berliner's patent. If Berliner made a discovery, it was simply a discovery that such minute variations of contact as could be produced between metallic electrodes would transmit speech to a limited extent. If Berliner or others have succeeded in finding that metallic electrodes can be balanced so delicately that they will transmit speech, this is not a discovery that is embodied in the defendants' transmitters. Edison, thinking of using such variations of contact, tried them before Berliner, and found them useless. He set about the problem of finding a contact material that was adapted to the preservation of contact, and adapted to produce a wide range of variations in the current. The advance in the art is due to what he discovered. If scientific men, by patient industry, succeed in stating some aspect or some peculiarity in which Berliner's and Edison's transmitters agree, this is not such a practical test of identity as the patent law requires. The only practical test of identity in this case is by comparing instruments of the Berliner type and instruments of the Edison type in respect to practical efficiency. The attempt to expand Berliner's unsuccessful experiments and caveat, first into an invention, and next into a broad claim for an art, method, principle, or process, exhibits a remarkable degree of ingenuity; but is not convincing. Mere changes of a current, not resulting in speech, do not make Bell's speaking current. A statement in writing that an instrument will produce any and all changes of current is not the equivalent of finding by experiment that it will do so. Variable pressure between electrodes in constant contact is not Berliner's novelty. It is not a sufficient account of a means of transmitting speech. Varying transition resistance is varying contact. The distinctions are between apparatus, not between methods. The discovery that minute variations of contact between metallic electrodes will transmit speech is not the discovery embodied in the defendants' transmitters. I am of the opinion that the defendants' transmitters are an invention substantially distinct from that disclosed in the Berliner patent; that the conception by Edison of the use of carbon for speech transmission preceded Berliner's conception of the use of solid metallic electrodes; that, from his first conception, Edison diligently proceeded upon a line

of experiments that led to an invention of remarkable character, which borrows nothing from Berliner, has no substantial resemblance to what is shown in the Berliner patent, and cannot be identified with it by any ingenious use of language. The defendants owe nothing to Berliner.

By this rescript I announce my decision; but will file, as soon as may be, a printed opinion, in which will be considered in further detail the questions of law and fact arising in this case. The bill will be dismissed, and a draft decree may be presented accordingly.

BROWN, District Judge. These suits are for infringement of letters patent No. 463,569, issued November 17, 1891, to the American Bell Telephone Company, as assignee of Emile Berliner. The patent states that the invention consists "in a new and useful improvement in transmitters for electrically transmitting sound of any kind." The defendants contend that the patent is invalid, and that claims 1 and 2, on which the complainant relies, are either invalid, or so limited in scope as not to include the defendants' devices.

The following drawing is from the patent:

*Fig. 1.*          *Fig. 2.*

The invention is thus described in the specification:

"It is a fact that if at a point of contact between two conductors forming part of an electric circuit, and carrying an electric current, the pressure between both sides of the contact becomes weakened, the current passing becomes less intense,—as, for instance, if an operator on a Morse instrument does not press down the key with a certain firmness, the sounder

at the receiving instrument works much weaker than if the full pressure of the hand had been used. Based on this fact I have constructed a simple apparatus for transmitting sound along a line of an electric current in the following manner: In Figs. 1 and 2 of the drawing, A is a metal plate well fastened to the wooden box or frame, but able to vibrate if sound is uttered against it or in the neighborhood of said plate. Against the plate and touching it is the metal ball C, terminating the screw-threaded rod B, which is supported by the bar or stand d. The pressure of the ball C against the plate A can be regulated by turning the rod, B. The said ball and plate are included in circuit with an electric battery, so that they form electrodes, the current passing from one of them to the other. By making the plate vibrate the pressure at the point of contact, a, becomes weaker or stronger as often as vibrations occur, and the strength of the current is thereby varied accordingly, as already described. By placing now, as is shown in the drawings, one such instrument in the station Fig. 1, and another instrument capable of acting as a telephonic receiver in the station Fig. 2, both situated on the same electric circuit in which a current is passing, as shown by the wire connections following the arrows, sound uttered against the plate of the instrument Fig. 1 will be reproduced by the plate of the instrument Fig. 2, for as the vibrations of the transmitter Fig. 1 caused by the sound will alternately weaken and strengthen the current as many times as vibrations occur, the diaphragm of the receiver will be caused by these electrical variations to vibrate at the same rate and measure. The latter vibrations being communicated to the surrounding air, the same kind of sound as uttered against the transmitter Fig. 1 will be reproduced at the receiver Fig. 2, or in as many other receiving instruments as are situated within the same electric circuit. It is not essential that the plate should be of metal. It can be of any material able to vibrate, if only at the point of contact suitable arrangement is made so that the current passes through that point. The plate may be of any shape or size, or other suitable vibratory media may be used,—a wire, for example. Any other metallic point, surface, wire, etc., may be substituted for the ball. There may be more than one point of contact to be affected by the same vibrations. Both of the electrodes may vibrate, although it is preferable that only one should. If the uttered sound is so strong that its vibrations will cause a breaking of the current at the point of contact in the transmitter, then the result at the receiving instrument will be a tone much louder, but not as distinct in regard to articulation."

The drawing shows two distinct instruments. The transmitter, Fig. 1, is the subject-matter of the patent in suit. Its plate is vibrated by sound waves, and the vibrations produce electrical undulations. It is conceded by the complainant that the instrument of the patent is substantially the old Reis structure illustrated in the Telephone Cases, 126 U. S. 40, 53, 58, 60, 191, 196, 31 L. Ed. 898, 903, 906, 908, 950.

Reis  G.R-70.

Reis G.R-69.

With this apparatus Reis, as early as 1861, transmitted musical tones. "He could sing through his apparatus, but he could not talk," for the reason that he broke the contact of his electrodes and interrupted the current. The apparatus, however, under expert manipulation, is capable of transmitting speech, though this was not accomplished until after Bell's discovery that the true way to transmit speech was to operate on an unbroken current. 126 U. S. 540–545, 8 Sup. Ct. 785–788, 31 L. Ed. 991–993. The receiver is represented by Fig. 2. Its plate is vibrated by electrical undulations, and the vibrations of the plate produce sound waves. The receiver is covered by another patent to Berliner, No. 233,969, dated November·2, 1880. The claims in issue are as follows:

"(1) The method of producing in a circuit electrical undulations similar in form to sound waves by causing the sound waves to vary the pressure between electrodes in constant contact so as to strengthen and weaken the contact, and thereby increase and diminish the resistance of the circuit, substantially as described. (2) An electric speaking-telephone transmitter operated by sound waves, and consisting of a plate sensitive to said sound waves, electrodes in constant contact with each other and forming part of a circuit which includes a battery or other source of electric energy and adapted to increase and decrease the resistance of the electric circuit by the variation in pressure between them caused by the vibrational movement of said sensitive plate."

The patent contains the following disclaimer:

"I do not claim that I am the first inventor of the art of transmitting vocal and other sounds telegraphically by causing electrical undulations similar in form to the sound waves accompanying said sounds. Neither do I claim that I am the first who caused such electrical undulations by varying the resistance of an electric circuit in which a current was passing."

The last sentence has reference to Bell's variable-resistance method described in the Telephone Cases, 126 U. S. 531, 536, 538, 8 Sup. Ct. 780, 783, 784, 31 L. Ed. 988, 990, and covered by the following claim of Bell's patent:

"(4) The method of producing undulations in a continuous voltaic circuit by gradually increasing and diminishing the resistance of the circuit. or by gradually increasing and diminishing the power of the battery, as set forth."

On page 323, 126 U. S., and page 963, 31 L. Ed., is shown "Bell's Centennial Liquid Transmitter," an instrument operating by the variable-resistance method covered by claim 4 of Bell's patent, 174,465, March 7, 1876. Though Bell's patent made no claim for apparatus operating by this method, his specification contained this language:

"Electrical undulations may also be caused by alternately increasing and diminishing the resistance of the circuit. * * * The external resistance may also be varied. For instance, let mercury or some other liquid form part of a voltaic circuit, then the more deeply the conducting wire is immersed in the mercury or other liquid, the less resistance does the liquid offer to the passage of the current. Hence the vibration of the conducting wire in mercury or other liquid included in the circuit occasions undulations in the current."

Prof. Wright, complainant's expert, says of this extract from Bell's patent:

"This describes a liquid transmitter, and I believe that any one familiar with electrical science, and having a knowledge of the state of the art as it was at that time, would have been able to construct an apparatus which could be used for the transmission of speech."

BELL'S LIQUID TRANSMITTER, 1876.

Speaking into the mouthpiece vibrates the diaphragm, whose movements cause the conducting wire attached to the diaphragm to move up and down in the liquid, thereby permitting more or less electricity to pass according to the extent of immersion. The liquid may be acidulated water or mercury. Prof. Cross, complainant's expert, says that this was the apparatus with which Bell first successfully transmitted speech, and that "the apparatus was and is perfectly operative." It was exhibited at the Centennial Exhibition in 1876. Prof. Cross describes the operation as follows:

"When the diaphragm vibrated, the wire dipped more or less deeply beneath the surface of the liquid, so that that portion of the wire from which the current flowed into the liquid was alternately increased and diminished, thus increasing and diminishing the resistance at that place, and so producing electrical undulations."

A comparison of this instrument with that of Berliner's patent is of principal importance in this case. The defendants rely upon it, not as a complete anticipation of Berliner's instrument or invention, but as an anticipation of the broad claims of the patent, and of the broad claims of the complainant's counsel and experts as to the character and importance of Berliner's invention. It appears by Berliner's testimony that, before constructing his instrument, he had carefully studied Bell's first patent, and that the metal plate or diaphragm, A, of Fig. 1, was taken from Bell's second patent, 186,787, January 30, 1877. What appears in Bell's patents, or in Bell's liquid transmitter, cannot be claimed as novel with Berliner. Upon comparison, we find the following resemblances: Each is apparatus for practicing Bell's art, process, or method of "transmitting vocal or other sounds telegraphically

* * * by causing electrical undulations similar in form to the vibrations of the air accompanying * * * vocal or other sounds." Bell's patent, claim 5. The treatment of the current described in the Berliner patent is the same as Bell's. Each is apparatus for practicing Bell's art by Bell's variable resistance method, i. e., "gradually increasing and diminishing the resistance of the circuit." Bell's patent, claim 4. The method of treating the resistance of the circuit is the same in each. Each receives the sound waves upon a diaphragm, which vibrates and effects changes in a circuit in which an unbroken battery current is passing, thus producing electrical undulations similar in form to sound waves. In each, there are electrodes in constant but variable contact. Each operates by a varying contact. In each, pressure is exerted upon the diaphragm by sound waves, and by one moving electrode upon another electrode; so that in each there is pressure between electrodes. In each, there is produced by the force expended upon the diaphragm a weakening and strengthening of the current, through the weakening and strengthening of physical and electrical contact of electrodes. Bell's liquid transmitter is, therefore, a complete anticipation of Berliner's transmitter in these particulars: In the use of a battery current, instead of a current generated by the transmitter instrument, as in Bell's magneto instrument illustrated in Bell's patent. See Fig. 7 in 126 U. S. 5, 31 L. Ed. 867. In the use of electrodes in constant contact with each other, and forming part of a circuit which includes a battery. In the use of the pressure of one electrode upon another to strengthen an electrical contact, and of a relaxation of pressure to weaken the electrical contact. It is, therefore, true, as the defendants contend, that claims 1 and 2 of the patent in suit, taken as they read in the ordinary sense of the words used, without limitation as to the size, shape, or materials of the electrodes used, are anticipated by Bell's liquid transmitter.

It may clear the discussion of this case if we observe that two distinct questions have been confused: Does Bell's liquid transmitter anticipate the first and second claims? Does Bell's liquid transmitter anticipate an invention made by Berliner? The complainant misstates the position of the defendants, saying on its brief that "the National Company contends that the 'Bell liquid transmitter,' briefly referred to in Mr. Bell's great telephone patent of 1876, was a microphone, and anticipated Berliner." The defendants do not so contend. The term "microphone," according to the complainant, denotes an instrument having solid electrodes. The defendants do not contend that Bell's liquid transmitter was a microphone. To the defendants' assertion that the claims cover Bell's liquid transmitter, as well as Berliner's, the reply is that Bell's liquid transmitter does not anticipate Berliner's instrument, nor Berliner's actual invention. This does not meet the true issue. The anticipatory effect of Bell's patent and of Bell's liquid transmitter cannot be ignored. The failure of the complainant to recognize this fully is a weak point in its argument. It is clearly established that Bell was a prior inventor of a constant but va-

riable-contact transmitter. It is also apparent that, in every trans-
mitter having a constant but variable contact of opposing elec-
trodes (a contact varying according to the vibrations of a dia-
phragm), there must be, as an invariable and necessary accom-
paniment, a variation of pressure between the electrodes. When-
ever, in transmitting sound, pressure is expended by one electrode
upon an opposing electrode, there is varying pressure, whether
the second electrode be of water or mercury, as in Bell's liquid
transmitter, or of powdered carbon, felt saturated with water, or
plumbago, as in Edison's devices, and whether the second electrode
yields to the force exerted upon it, or resists this force. It is
manifest, therefore, that, when Bell invented a transmitter in which
there was a varying contact between opposing electrodes, he also
invented a transmitter in which varying contact was inseparably
associated with varying pressure. To claim broadly variable pres-
sure between electrodes is to claim in other words variable con-
tact of opposing electrodes. The claims of the patent are such as
could properly be made, if at all, only by the inventor of the first
transmitter having a constant but variable contact of opposing
electrodes, i. e. Bell. As varying pressure is a uniform accompani-
ment of varying but constant contact of opposing electrodes, one
who desired to define Bell's liquid transmitter, so as to distinguish
it from the Bell magneto instrument, which had no electrodes in
contact, or from the Reis transmitter (with an inconstant or broken
contact), might do so by reference to either of the novel features
of Bell, and say that its novelties were either "constant contact"
or "variable pressure," or both. Either of the two names will
distinguish a constant-contact transmitter from the Bell magneto
instrument, or from the Reis apparatus when operated according
to Reis' method. Definition by a single novel feature, under some
circumstances, is quite as good as definition with a full enumera-
tion of particulars, but it may lead to fallacy by creating two
names for one thing. Berliner was not the inventor of the first
constant-contact transmitter. His instrument cannot be distin-
guished from previous or subsequent constant-contact transmitters
by referring to a single feature not novel with him, but possessed
by several transmitters. Therefore he must point out, in his claims,
some distinctive difference between his invention and what is dis-
closed in the Bell liquid transmitter, in order to show his advance
in the art. His apparent difference is merely in apparatus, but
his apparatus is so inefficient commercially that if his patent is
to be construed merely as for apparatus, the complainant's case
is hopeless on the issue of infringement. The complainant, there-
fore, rests its case upon the proposition that Berliner's invention
was a "new mode of operation," and from this arise the principal
difficulties in the case. The complainant starts the search for nov-
elty at Bell's magneto instrument, and at the instrument of Reis,
and not from Bell's prior variable-resistance transmitter and, upon
its brief, contrasts Berliner's apparatus with Bell's magneto trans-
mitter, and with the Reis transmitter, first saying of Bell's mag-
neto transmitter:

"The apparatus of Mr. Bell was exceedingly perfect, both in its theory and in the practical results which were reached by it. But the currents produced by the transmitter were extremely feeble, since the currents utilized were generated by the transmitter itself; and its motions, as it was actuated only by the sound waves due to the voice, were but slight."

The brief then says, in italics, "Mr. Berliner remedied this defect," and made a new type of transmitter, which employs Bell's method of transmitting speech. "It is what is known as a 'variable-pressure contact transmitter.' It operates, not as did the magneto transmitter, to generate the undulatory current produced by the small amount of energy which the voice can communicate to the transmitter, but simply to impress upon the electrical current furnished from another source—practically a battery—variations in strength which correspond to the motions impressed by the voice upon the transmitter." But this is true of Bell's liquid transmitter, and was true of it in 1876, when it was exhibited at the Centennial. Berliner's transmitter in this respect was not a "new type of transmitter," but merely a species of a new type of transmitter invented by Bell. It is a remarkable fact that in spite of the testimony of Prof. Wright that the Bell patent sufficiently disclosed a liquid transmitter to enable a person skilled in the art to make one, and in spite of the testimony of Prof. Cross that the Bell liquid transmitter was, and is, perfectly operative, the complainant should ignore the Bell patent and Bell's liquid transmitter, and explain Berliner's invention by saying that in Bell's magneto instrument the currents were very feeble, since they were generated by the transmitter itself, and by saying, in italics, "Mr. Berliner remedied this defect." Such a contention cannot be sustained. Bell's patent suggested the use of a battery current, and Bell's liquid transmitter used it in 1876. Berliner's apparatus has never been used commercially, and made no practical advance on Bell's magneto transmitter. The error of attributing to Berliner the credit of an advance upon Bell in the substitution of a battery current for a current generated by the transmitter rendered necessary a footnote to the brief:

"It is true, of course, that Mr. Bell also suggested in his magneto patent that he could produce an undulatory current by varying the resistance, but he made no suggestion whatever that this could be done by varying the pressure between two electrodes in contact."

After the opinion of the supreme court in the Telephone Cases as to the variable-resistance method (126 U. S. 538, 246, 247, 8 Sup. Ct. 784, 31 L. Ed. 990), in explaining the importance of Berliner's work, counsel for the Bell Telephone Company call Bell's great patent "Bell's magneto patent," and ignore the instrument with which Bell first transmitted speech. This is a confession of fundamental weakness in the complainant's case. It is essential to the complainant's argument that the true scope of Bell's variable-resistance method, and of Bell's work in applying that method, should be ignored, in order that the Berliner patent may be construed as for a new "method," instead of for practically useless apparatus for practicing the variable-resistance method of Bell. The complainant further proceeds to show the nature of Berliner's

invention by stating, as a main proposition on the brief, "Berliner's inventions do not reside in the structure involved." Berliner, "using substantially the old Reis structure," produced a "new mode of operation." In explaining this, the brief again ignores Bell's liquid transmitter, and reverts to Reis, quoting the language of the supreme court to the effect that the question is "not as to the character of the apparatus, but as to the mode of treating the current of electricity on which the apparatus is to act." It refers to Berliner's "new electrical mode of operation," and also quotes the language of Prof. Cross:

"Structure here is not the controlling element. In machines generally the operation and the result are absolutely controlled and defined by the structure and organization of the machine. But this simple contrivance is more like a tool because it can be compelled at the pleasure of the operator to perform the breaking operation and produce the broken Reis current, or to perform the variable-pressure operation and produce the undulatory current."

Berliner's "new electrical mode of operation" or mode of treating the current is new as to Reis, because it has that novelty which the supreme court has decided to constitute Bell's advance upon Reis. His mode of treating the circuit is new as to Reis in that the contact is not broken, but this is Bell's novelty. The complainant's patent does not refer to any new treatment of an electrical current, and disclaims novelty in causing electrical undulations similar in form to sound waves. As a substantive part of its case, the complainant has claimed for Berliner as distinctive features the use of a battery current and constant contact of electrodes, both of which are Bell's. Although the patent expressly disclaims that Berliner was the first to cause electrical undulations by varying the resistance of an electrical circuit in which a current was passing, and disclaims novelty in the production of electrical undulations similar in form to sound waves, the brief in effect retracts this disclaimer by showing Berliner's novelty against a prior art, from which is excluded what the patent by its disclaimers acknowledges was old at the date of the application. Bell's liquid transmitter is not in the prior art of the complainant's case. The attempt to dispose of that apparatus by characterizing it as a mere laboratory experiment, after Prof. Cross' evidence that it is an operative instrument, and after it was presented to the supreme court as a speaking telephone (126 U. S. 247, 322), is not successful. This instrument is quite as important after the expiration of Bell's patent as it was before. It was the primary instrument employing the variable-resistance method, and after it the problem was to improve upon Bell's electrodes. Improvement upon the resistance of the circuit was not a new art or method. Whatever the particular kind of resistance, whether "contact resistance" or "mass resistance," the method of varying it is Bell's.

I am of the opinion that upon Bell's liquid transmitter the defendants have established their first defense, to wit:

"In the state of the art of electrical telephony in 1877, there was nothing in the Berliner transmitter of patent No. 463,569 patentable over Bell as an art (claim 1), nor anything patentable as mechanism (claim 2), unless in the sub-

stitution of a solid metal electrode for Bell's mercury electrode, which substitution only reproduced a Regnault or a Reis instrument, to be operated by Bell's method."

It appears also that there can be only two narrow grounds upon which the Berliner patent can stand: (1) That it was patentable to apply Bell's variable-resistance method to the apparatus of Reis; (2) that it was patentable to substitute a solid metal electrode for Bell's mercury electrode. I am further of the opinion that these claims are invalid for excessive breadth, under the decision of the supreme court in the Incandescent Lamp Patent, 159 U. S. 465, 476, 16 Sup. Ct. 75, 40 L. Ed. 221, as attempting to monopolize the use of the pressure of one electrode upon another to effect changes in the circuit, and also as attempting to monopolize the use of apparatus operating by changes of contact between opposing electrodes, even if the electrodes be limited to solids. Prof. Cross, upon the prima facie case, was asked, "Is the patent confined to any particular size, shape, or materials of the electrodes?" and replied that "the patent is not in any way thus limited. * * * There is no limitation as to this matter in claims 1 and 2 of the patent."

In argument, counsel for complainant, in setting forth the "remarkable character of Berliner's invention," and its great importance, state:

"That this invention is broadly covered, and conceded to be broadly claimed in the patent in suit, is stated in this bill [brought by the government for the annulment of the patent]: 'And your orator avers further that the broad claims of said patent cover in their scope every form of constant-contact telephonic transmitter which it is possible to make, and that, so far as can be foreseen, the possession of said patent, if it is valid, will continue to the respondent company without substantial diminution during the full term thereof the same close monopoly of the art of telephony in the United States which it has enjoyed under said patent to Bell, 174,465.' "

I believe these claims to cover broadly all transmitters having variable contact of opposing electrodes. They certainly are broad enough to cover every variable-contact transmitter that has been presented in this case. The concessions made by the complainant are sufficient to prove that these claims are what were termed in Carlton v. Bokee, 17 Wall. 471, 21 L. Ed. 517, "ingenious attempts to expand a simple invention of a distinct device into an all-embracing claim, calculated by its wide generalizations and ambiguous language to discourage further invention in the same department of industry and to cover antecedent inventions." It is a familiar rule that a generalization or definition that is too broad cannot be made good by making an arbitrary exception of each case that comes within its terms, but which should not have been included. A single contrary example destroys the generalization.

The complainant claims broadly variation of pressure between electrodes in constant contact. This first conflicts with Bell's liquid transmitter. A liquid electrode is then excepted, but the exception of a liquid electrode still leaves the complainant claiming the mode of operation by variable contact for all electrodes other than liquids. The claims limited to solid electrodes next

come into collision with devices of Edison. The effect of these devices as anticipation will be considered later. We now consider them merely in connection with concessions of the complainant that the claims should not cover them.

## *Edison 8-11.*

FEBRUARY 9, 1877.

This device has solid electrodes, and was an operative telephone in February, 1877. It is the basis of Edison's patent 474,230, applied for April 27, 1877. Its electrodes are a diaphragm of sheet metal, and a disk of hard rubber coated with plumbago, or a disk of some conducting metal or substance. In this apparatus Edison employed a battery current and constant contact. There was variable pressure between solid electrodes as in Berliner's apparatus. The complainant excepts this from the Berliner patent by saying that it operates by varying surface area of contact, and by varying the length of the path of the current outside of the area of contact, which is said to be different, theoretically and practically, from Berliner's method. It is nevertheless within the claims.

## *Edison 42-11.*

APRIL 1, 1877.

The claims are next confronted with apparatus of Edison dated April 1, 1877, which has solid electrodes. It consists of a diaphragm and "five vertical springs, each provided with a sleeve carry-

ing a cylinder or button of hard-pressed plumbago fastened to a bar of insulating material. All the plumbago buttons were in contact, and the one at the end rested against a diaphragm. The circuit was complete from the first spring through all the carbons to the last spring." This the complainant says is not a variable-pressure transmitter, for the reason that Edison intended, by the vibration of the diaphragm, to compress electrodes of plumbago; thereby changing the molecular condition of the material of a part of the circuit. Counsel distinguish this, and impliedly limit the electrodes of the patent to solid electrodes having "transition resistance" due to a loose joint, by saying that the Edison device does not operate by variation of transition resistance. There can be no question but that, if Berliner had preceded Bell, Bell's liquid transmitter would infringe claims 1 and 2, both as to constant contact and variable pressure. If Berliner had preceded Edison, either of the devices shown would infringe the Berliner claims. The logical difficulty with the claims of the Berliner patent, in view of Bell's liquid transmitter and its position in the prior art, is that in attempting to define and mark out Berliner's novelty, they refer only to features that are common to Bell and Berliner, and not to the distinctive difference. It is definition "per genus," and not definition "per genus et differentiam," and the genus is Bell's. This is a defect not only of the claims, but of what may be termed the "variable-pressure" aspect of the complainant's argument. Practical accuracy, logical rules of definition, and rules of law alike require that a definition shall include a statement of the distinctive difference. If we stop short of that, we err by being too vague. Though the complainant contends with great earnestness that Edison's devices are distinguishable from Berliner's, yet it is apparent that, in the same way that the claims fail to express a distinctive difference between Bell's liquid transmitter and Berliner's, they fail to express a difference between Berliner's and the devices of Edison. To the objection that the claims are so broad as to include these devices, it is obviously no answer to reply merely that these devices are not analogous. I am of the opinion, therefore, as the claims are statutory requirements, prescribed for the purpose of making the patentee define precisely what the invention is,—and as these claims are so broad as to include every transmitter of the general class of which Bell was the first inventor, and which is exemplified in his constant-contact transmitter,—that they are invalid for excessive breadth, and for a vague generality which makes them a constant menace to all inventors who may seek to improve the art of telephony by applying what Bell has taught as to the practicability of operation by the constant but variable-contact method. This is also true if the electrodes are limited merely to solids. By claiming "variable pressure of electrodes" as an art or method, the complainant seeks to monopolize an indispensable feature of every constant-contact transmitter having varying contact and opposing electrodes, and to suppress all subsequent invention in the same field. Walk. Pat. § 14. Counsel say that the method of operation by variable pressure is available "in the case of all electrodes which have surfaces between which there may be varying pressure." It is

obvious that this language does not exclude even the liquid electrodes of Bell; and that, as all solids have surfaces of this kind, it includes the solid electrodes of Edison.

The final position of the complainant, upon the supplemental brief, is that the method of varying resistance in a battery circuit "by causing sound waves to vary pressure between electrodes in contact" so as to "strengthen and weaken the contact" is a more specific and hence different thing from the mere effecting of "some physical change in the path of the current." Counsel fail to meet the actual contention that it is not a specific description sufficient to distinguish Berliner's method from effecting such physical changes in the path of the current as occur in Bell's liquid transmitter and in various devices of Edison.

I am of the opinion that the language of these claims is clear and that no resort to the specification is necessary to explain its meaning. They are not claims made in the infancy of an art by an unskilled inventor. They were put in the present form more than two years after Edison's carbon telephone had been placed on the market. They cover, if not every form of constant-contact transmitter which it is possible to make, at least every form that has been presented. They cover the use of variable pressure exerted by one electrode upon another, to vary the resistance of the circuit. They cover also all transmitters having a variable contact of opposing electrodes. They cover under a new form of words what was previously invented by Bell. To save these claims it is necessary, not to explain them by resort to the specification, but to ingraft upon them restrictive qualifications which the patentee omitted to point out. This may not be done "for the purpose of changing it and making it different from what it is." White v. Dunbar, 119 U. S. 47, 7 Sup. Ct. 72, 30 L. Ed. 303; Howe Mach. Co. v. National Needle Co., 134 U. S. 388–394, 10 Sup. Ct. 570, 33 L. Ed. 963; Paul Boynton Co. v. Morris Chute Co., 30 C. C. A. 617, 87 Fed. 225; Day v. Railway Co., 132 U. S. 98, 102, 10 Sup. Ct. 11, 33 L. Ed. 265; Merrill v. Yeomans, 94 U. S. 568, 570, 24 L. Ed. 235; Railroad Co. v. Mellon, 104 U. S. 118, 26 L. Ed. 639; Incandescent Lamp Patent, 159 U. S. 465–472, 16 Sup. Ct. 75, 40 L. Ed. 221.

Later in this opinion, we will consider further the merits of the complainant's contention as to the importance and scope of what Berliner is said to have accomplished. Even if it be assumed that the complainant is lawfully entitled to the patent upon which its arguments are based, I am of the opinion that the argument by which the complainant seeks to show that the patent discloses an invention of broad character and scope is logically and legally unsound, and that what is described in the patent was, in view of the state of the art, of slight value and of narrow scope. But before considering the reasons for this conclusion, we will consider the question of the validity of the complainant's title to the letters patent.

The case presents this remarkable feature,—that the application in terms denies that the instrument of the patent is adapted to the transmission of speech. The patent covers the transmission

of speech by an instrument which the application does not describe as a speech transmitter, but, on the contrary, says is not adapted to the transmission of speech. Berliner's application filed June 4, 1877, was not for the invention covered by letters patent issued to the American Bell Telephone Company, as Berliner's assignee, on November 17, 1891. Upon this question we need consider only the single feature of "electrodes in constant contact" for speech transmission. The inquiry whether the application describes the "variable-pressure" method of Berliner is the same as the inquiry whether it discloses the constant but variable contact method of Bell, and whether it calls for the use of an unbroken current. The supreme court, in the Telephone Cases, 126 U. S. 544, 545, 8 Sup. Ct. 787, 31 L. Ed. 992, 993, found that Bell discovered the true way to transmit speech,—"to operate on an unbroken current by increasing and diminishing its intensity,"—and that Reis, who preceded Bell, failed because he operated with a current made intermittent by the opening and closing of the circuit; saying:

"To follow Reis is to fail, but to follow Bell is to succeed. The difference between the two is just the difference between failure and success. If Reis had kept on he might have found the way to succeed, but he stopped and failed."

We shall find that Berliner did follow Reis, as a matter of fact, and that he failed, as a matter of fact, through attempting what was described by one of the examiners as a "kind of cross between the microphone and the Reis circuit-breaking instrument." Our present question, however, is merely whether a document sworn to and filed by Berliner discloses a constant-contact speech transmitter, upon an examination of its text and drawings. The examiner on January 31, 1882, decided that it did not, and filed on appeal before the commissioner an answer which, in my opinion, conclusively shows that the invention disclosed in the application was not a speaking telephone, and not a constant-contact speech transmitter. The rejection of amendments by the examiner was overruled by the commissioner, but it does not appear that he answered the specific reasoning of the examiner. A second examiner also made a ruling adverse to the amendments, which was reversed by the board of examiners on appeal, in a decision which stated:

"It seems to be clear from this review of the original specifications that, so far as can be judged from the language used, two things were disclosed by it: First, the transmission of musical sounds, whether uttered by the human voice, as in singing, or produced by musical instruments; and, secondly, the transmission of speech by means of a make and break of contact through the use of the secondary device. It is to be noted, however, that, even as to speech, Berliner's statement is merely that he had succeeded in reproducing the vowels and other special sounds."

The board held, however, that the commissioner's prior decision permitting amendment bound the board, and reversed the examiner. This opinion of the board as to the meaning of the language used seems sound. While this court is not bound by these decisions of the patent office, and looks to them merely as interpretations of this document referred to in both briefs, it may be said that the weight of reasoning is very decidedly with those officials who found that the

application was not for a constant-contact speech transmitter, and that the weight of decision in the patent office upon the sufficiency of the original application is decidedly against the complainant. We will consider this matter on its merits. A comparison of the two documents seems to me to settle this question. There has been in this case a great abuse of the use of expert testimony. Experts have offered their views upon questions that are entirely outside their province. They have entered into argumentative discourses upon the meaning of a document which is plain upon its face and expressed in terms of ordinary speech that require no expert explanation. The question of the meaning of the text, and the question of mistake in writing the text, questions of fact as to the intention of the applicant when he wrote the text, evidence as to the state of the art having no bearing whatever upon the meaning of terms, and arguments as to the meaning of isolated portions of the text, have been so confused as to obscure the real questions. Did the original document filed by Berliner, read as a whole, disclose the invention of the patent? Did it disclose the fact that Berliner had discovered that speech could be transmitted with the instrument of the patent? Did it show that Berliner had made any advance upon Reis, or intended to claim anything more for the instrument of the patent than the transmission of musical sounds? The question whether certain portions of this document were inserted through mistake, and whether, when amendments and corrections are made, the application discloses the invention, is, of course, an entirely distinct question, that should not be confused with the present inquiry. The application, referring to instruments substantially similar to those of the patent in suit, says:

"If now the plate of one instrument, as in Fig. 3, is vibrated by sound waves, which happens whenever any kind of sound is uttered or produced by musical instruments in its neighborhood, every wave or vibration that strikes the plate will cause a weakening of the point of contact, x, or also, if the sound is sufficiently strong, a break of the electric current at that point. It is evident that changes thus occurring at the plate of one instrument will be noticed at the plate of the other, or in any such instruments that are situated within the same electrical connection and, as often as one plate is caused to vibrate, just so often will the others vibrate, caused by the break or the weaking of the electrical current. The same kind of sound, therefore, which affects the plate of the first instrument, will be reproduced by the plate of the others."

Fig. 3

Immediately following this is a statement which seems conclusive of the question whether the application claims a constant-contact operation for speech transmission,—a statement by Berliner, under oath, on June 4, 1877, which, unless proven to be a clerical mistake, is fatal to the complainant, not only on the question immediately under discussion, but on the fundamental question of whether, in fact, Berliner invented a constant-contact speech transmitter:

"These simple instruments will reproduce any musical sound uttered in the neighborhood of one of them, but for the reproduction of special sound such as speech they are not adapted, for the following reasons: In accept-

*Fig 7.*

ing the graphical name of wave for a vibration, we must consider the same to have two dimensions, namely, length and depth or height. In Fig. 7, I have represented three sections of waves, all of the same length and height, yet they differ in shape, and their highest point is not always situated in the center of their length. Such is the case with sound waves of various kinds of sounds. In a pure musical tone the shape of the wave is entirely regular, like in section I, but in every other sound this is not the case. It is therefore evident that the apparatus described thus far cannot but transmit a pure musical sound, because it transmits only the number of vibrations per second which is equal to the lengths of the waves, but nothing of the nature of each wave and the shape of their curves is recorded."

The statement of the insufficiency of these instruments to transmit speech is accented by the following description of the instrument, which was filed by Berliner as his model speech transmitter:

"This I accomplish however by situating within the vibrating field of the plate, A, a second screw, E. In Fig. 6, the dotted line indicates the vibrating field of the plate, B, the screw in contact with the plate, and E, the second

*Fig. 6.*

screw. It will now happen in special sounds (meaning the nature of every sound besides its certain musical pitch) that the plate will not always strike the screw, E, in the middle of the duration of one wave or vibration, and taking, for instance, the duration of one wave to be one minute, the plate in special sounds will sometimes strike the screw, E, sometimes after twenty or twenty-five seconds from its beginning. This, now, is exactly recorded by this secondary screw, E, which also makes an electric connection whenever the plate, A, touches it, and at the receiving apparatus these special sounds will there-

fore be noticed. I have thus succeeded in reproducing a great many special sounds, such as the vowels and others. The principle of reproducing special sounds by break and make of contact rests mainly in the use of this secondary contact screw.

*Erase per Substitute Drawing filed Sept. 10/77.*

*Fig. 2.*

*Fig. 1.*

"In the drawing the point of this second screw consists of a piece of spring steel bent in semicircle. This is sometimes advantageous, but not absolutely necessary."

It will be observed that this drawing shows, in connection with the two pins, a hearing tube, K, and a speaking tube, O. It is idle to contend that, with this portion of the specification retained, and read in connection with the claims and other parts of the specifica-tion, the application was for a constant-contact speech transmitter. Applying the legal rule that a document must be read as a whole, and reading it as it stands, it is fatal to the complainant's conten-tion. The application expressly disclaims speech transmission by the instrument of the patent, and claims as a speech transmitter a double-pin instrument operating to make and break the contact of electrodes. Berliner's model filed with his application was a dou-ble-pin instrument. The patent calls for constant contact of elec-trodes and an unbroken current; the application for an interrupt-ed contact and a broken current. The supreme court has decided that these methods are radically distinct. 126 U. S. 544, 545, 8 Sup. Ct. 787, 31 L. Ed. 992, 993. We can find nothing upon the face of this document that requires the court, as a matter of construction, to reject any portion of the text, or to interpolate any words which the context proves to have been omitted.

The complainant contends that the statement that the single-pin instruments are unadapted for the transmission of speech is incon-sistent with other portions of the text. It is said that the phrase, "whenever any kind of sound is uttered or produced by musical in-struments," is an assertion that speech is to operate the single-pin transmitter. But is this so? The word "uttered" is used in the following paragraph to indicate the production of musical sound, thus

"These simple instruments will reproduce any musical sound uttered in the neighborhood of one of them, but for the reproduction of special sound, such as speech, they are not adapted."

The word "uttered" is used elsewhere in the application in the sense of produced. The board of appeals said:

"The use of the word 'uttered' in the latter part of the specification is significant; for, while it might appear from its use in the former part that it meant speech, this presumption is overcome by its use in the latter part in connection with musical sound."

This is proper construction. The phrase has no reference to speech transmission. The word "uttered," being ambiguous, is to receive that interpretation which reconciles it with the rest of the text, rather than that which brings it into conflict therewith.

It is then said that Berliner has stated that a "weakening of the current can be observed," and that changes at the transmitter that weaken the current can be observed at the receiver. But there is no inconsistency between the statement that weakenings can be observed, and the statement that the instruments will not transmit speech. If some audible effects are referred to as produced by weakening the current, this is not speech. The document does not claim that, within the range of weakenings of the contact of the pin and diaphragm, speech can be transmitted. On the contrary, this is denied, and another inconsistent method is shown. Berliner has described the operation of the musical sound transmitter as a

composite operation of weakenings and breaks of the current, saying that, "as often as one plate is caused to vibrate, just so often will the others vibrate, caused by the break or the weaking of the electrical current." The statement relative to the irregularity of the sound waves, and that nothing of the nature of each wave and the shape of their curves is recorded, applies to the composite operation, and to both parts of it,—the weakenings as well as the breaks. The reproduction of special sounds is attributed solely to the supposed fact that the height of the waves is recorded by a contact with the second screw following a break of the circuit. It is said that the words "any sound" include speech, and that therefore the subsequent statement that speech cannot be transmitted is inconsistent therewith. But the words "any sound" must be interpreted in connection with the specific exception of "special sound such as speech," which follows. The contention that the particular clause is a contradiction of the general clause is in effect a claim that a specific exception to a general statement should be rejected as inconsistent. We may test the validity of this method of construction by applying it to other text: "Of every tree of the garden thou mayst freely eat, but of the tree of knowledge of good and evil, thou shalt not eat of it." Upon such a mode of construing text, the general permission is inconsistent with the special exception. Therefore the exception should be eliminated. Such a mode of construction doubtless led to the fall of man. Legal rules of construction require that particular force be given to the specific exception. Bock v. Perkins, 139 U. S. 628, 634, 637, 11 Sup. Ct. 677, 35 L. Ed. 314.

It is further contended that the passage, read as it stands, would "make nonsense of his first three claims, which would be for inoperative combinations, the first of which would be entirely indistinguishable from the Reis transmitter, and the other two substantially indistinguishable." But this is not so. The first claim of the original specification is as follows:

"(1) An instrument for transmitting and reproducing sound waves by the agency of electricity, consisting of a metallic diaphragm or other vibratory medium connected to or forming part of one pole of an electric circuit, and arranged in contact with the opposite pole thereof, and capable of being put into vibration by the action of the electric current substantially as set forth."

The second is substantially the same.

If this claim, as counsel for the defendants contend, is a claim for a receiver only, there is certainly no inconsistency. The words, "capable of being put in vibration by the action of the electric current," have no application to a transmitter, and support this view. The complainant relies, however, upon the words "for transmitting" to overcome the force of this clause. In U. S. v. Bell Telephone Co., 167 U. S. 264, 17 Sup. Ct. 809, 42 L. Ed. 144, it was said, "In a sense, the receiver is also a transmitter, for it passes the sounds from the wire to the ear." If, then, we should find, that, reading this claim as for a transmitter, it was inconsistent with other portions of the text, we should, as a matter of construction, avoid this inconsistency by interpreting the word "transmitting" in the sense referred to in the opinion of the supreme court, following

the rule that the text should be harmonized if possible. But, on the other hand, the claim can be read as for both a transmitter and a receiver without encountering any inconsistency. The single-pin transmitter's functions are described elsewhere as the production of musical sounds. A claim is not nonsensical that describes an instrument both as a receiver and as a transmitter of musical sounds, even if the instrument as a transmitter is substantially the Reis transmitter. Many patents describe and c  m in clear language that which has been invented previously. They cannot for that reason be characterized as nonsensical. The third claim of the application is:

"The combination in one circuit of two or more vibratory diaphragms and contact pins adapted to operate similarly for the production and transmission of sound waves when one diaphragm is caused to vibrate by means of any sound, substantially as set forth."

This last clause makes particular reference to the specification and limits the function of the two instruments to the transmission of musical sound. A novelty is shown in the claim, and there is no nonsense here. There is nothing on the face of this text that requires us either to reject any part of it, or interpolate anything as omitted. Reading this document by itself, it is clear and consistent. Upon the view that there was no intention to describe or claim a constant-contact speech transmitter, there is no inconsistency or confusion. When we attempt to read it as for a constant-contact speech transmitter, then all is confusion, inconsistency, and contradiction. The complainant contends that the patented invention was both described and claimed in the application before a word was altered by amendment, but, in support of this contention, argues that there was error in the expressions used, and mistake in the text. In considering whether portions of this document disclose a constant-contact mode of operation for the transmission of speech, the complainant contends that the specification was addressed to a person skilled in the art, and that this person would have known that there was no novelty in make and break of contact, and that speech could not thus be transmitted. It is then argued that for this reason the language must be interpreted as if the breaks were referred to as accidental. But surely such an assumption could not authorize us to reject an express statement by Berliner in this very document that he was attempting to reproduce special sound "such as speech" by make and break of contact, and that he had thus succeeded in reproducing a great many special sounds, such as the vowels and others. The document itself, on its face, disposes of the assumption, for purposes of construction, that Berliner knew better. Circuit breaking by two pins was new, not old. Berliner claimed it for speech transmission, and shows in his drawings a circuit breaker provided with a mouthpiece and earpiece, and refers to this instrument when he says that "the operator is not in need of handling the instruments sidewards or moving his head while a conversation is carried on." And there seems to be no substantial ground for the statement of Prof. Cross that the "circuit-breaking operation was known to be old, worthless, and in-

capable of producing speech." The examiner considered many applications for circuit-breaking apparatus as late as 1882, and it appears that a circuit-breaking transmitter was greatly desired in order to avoid the Bell patent. But even did the document elsewhere on its face fail to disclose the fact that Berliner was attempting a make-and-break operation, and were we simply construing those passages that relate to the single-pin instrument, we could not reject a distinct statement because it was erroneous as a statement of fact. The attempt to construe this instrument according to supposed knowledge of the art completely fails, because Berliner expressly states that he thought otherwise than the expert is supposed to think, as well as because, on a question of the construction of text, a reference to the state of the art is permitted only for purposes of explanation, and not to contradict plain language. In Simpson v. Holliday, L. R. 1 H. L. 315, 322, it was said:

"This does not warrant us in giving effect to a specification claiming two things, one practicable and the other impracticable, because a skillful workman would know that one of them could not be acted upon, and so would confine himself to the other. This would not be to construe a specification according to the language of workmen, instead of according to our ordinary language, but to reject something claimed by the patentee, because a workman would know that it was an impracticable claim."

In Clark v. Adie, 2 App. Cas. 436, Lord Blackburn said:

"When it is attempted * * * to say that inasmuch as these specifications show, or are alleged to show, matters which, upon a fair construction of the specification claimed by the patentee, were old at the time that the patent was taken out, and were generally known to be old, therefore the specification must be so construed as not to include them, that seems to me to be both contrary, as far as I know, to the course of decision, and contrary to principle. * * * It would afford a very simple recipe for saying that no patent should ever be upset upon the ground of want of knowledge. If, when you say that you can show that a thing was old at the time the patent was granted, you are to construe the specification as not intending to claim that, because the man who claimed it would be suicidal and foolish, it would be a recipe for saying you shall never upset a patent at all for want of knowledge."

The question which counsel undertake to argue is, what does the document say? This is a question entirely distinct from the question of what it might have said or what it should have said, and from the question of mistake. In Soda Fabrik v. Kalle (C. C.) 94 Fed. 168, upon the question whether a certain document disclosed an invention so as to constitute an anticipation, it was argued that a certain statement was a mistake. Judge Coxe said:

"The court has simply to consider what the publication in question has contributed to the art. If it fails to show the invention which it is said to anticipate, the contention that its author knew enough to write an anticipation and intended to do so is grotesquely irrelevant."

The argument whereby the complainant endeavors to show that the original application could support the patent in suit is a labored attempt to place upon plain and unambiguous language forced interpretations which do not explain, but destroy, its natural signification,—interpretations which do not explain, but contradict. I am of the opinion, therefore, that the patent in suit cannot depend upon the original application, since it is for an invention radically

distinct from anything described or claimed in the original application.

The radical difference between a make-and-break transmitter and a constant-contact transmitter having been shown by the decision of the supreme court in 126 U. S., 8 Sup. Ct., and 31 L. Ed., the next question to be considered is whether the original application could, under legal rules, be so amended as to serve as the basis of the patent in suit. The supreme court, in Railway Co. v. Sayles, 97 U. S. 563, 24 L. Ed. 1057, said:

"If the amended application  *  *  *  embodied any material addition to or variance from the original,—anything new that was not comprised in that, —such addition or variance cannot be sustained on the original application. The law does not permit such enlargements of an original specification, which would interfere with other inventors who have entered the field in the meantime, any more than it does in the case of reissues of patents previously granted. Courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to enable the patentee to appropriate other inventions made prior to such alteration, or to appropriate that which has in the meantime gone into public use."

In no case can there be stronger reasons for applying this rule than exist in the present case. See, also, Hobbs v. Beach, 180 U. S. 383, 396, 21 Sup. Ct. 409, 45 L. Ed. 586.

I am of the opinion that this patent is invalid for the reasons that the power to amend an application does not include the power to change the nature of the invention; that the right to amend or the right to complete an application under section 4894, Rev. St. U. S., does not give the right to transform completely; that the only remedy for a radical mistake in substance so serious as to require a transformation so complete as is here shown is a new application. Rob. Pat. §§ 561, 635; Consolidated Electric Light Co. v. McKeesport Light Co. (C. C.) 40 Fed. 21–27; Railway Co. v. Sayles, 97 U. S. 554–563, 24 L. Ed. 1053; Michigan Cent. R. Co. v. Consolidated Car-Heating Co., 14 C. C. A. 232, 67 Fed. 121.

The first amendment affecting this controversy was made by Berliner on August 8, 1877, when he struck out the passage denying that the single-pin instruments could transmit speech, and also the claim for the double-pin instrument. The complainant contends that the application thus amended was a sufficient basis for the patent in suit. Assuming that the August amendment amounts to an assertion: "My single-pin instrument can talk. I strike out the reasons why it can't, and also the double-pin instrument, which for these reasons I previously said could talk,"—here is a positive and clear contradiction of the former application, and the introduction of matter radically distinct. If this amendment is to bear this construction, I agree with the learned counsel for the defendants, that "probably no such flagrant instance of an application filed for one thing, and then contradicted into its very opposite,  *  *  *  can be found in the books." If this was the effect of the amendment, it was clearly inadmissible.

Between the date of Berliner's application, June 4, 1877, and his amendment of August 8th, there appeared a publication in the

Philadelphia Press of July 9, 1877, in which was described a constant-contact variable-pressure speech transmitter, the invention of Edison. The apparatus included a diaphragm with a plumbago electrode in contact therewith.

"This, again, is another original discovery of Mr. Edison's, viz. that plumbago changes its electrical resistance with enormous rapidity under pressure; the effect in this application being that when the diaphragm is vibrated weakly contact is made with the plumbago point very lightly, and the resistance of the plumbago being but slightly reduced a weak current is sent out from the battery, and a weak effect produced at the receiving station. When, however, a strong pressure of the diaphragm is effected by reason of the exercise of a more powerful vibration of the voice, the resistance is very greatly reduced, and a strong current passes to the line and a strong or loud effect is produced at the receiving station. Hence the amount of power, with all its fine gradations, generated by the voice at the transmitting station, is transmitted in its proportions to the receiving instrument, and thus the fine articulation of the voice is obtained."

On July 20, 1877, Edison filed an application for letters patent No. 474,231, which covers completely all that is now claimed for Berliner. See 126 U. S. 278. It is apparent that amendments filed after this would interfere with another inventor, and that Berliner's amendment must, in any event, bear date as of August 8, 1877, and cannot relate to the date of filing the original application. But the contention that the amendment of August 8th made the application a sufficient basis for the patent in suit is unfounded. Striking out the only speech transmitter claimed did not introduce a new speech transmitter. The mode of operation remained unchanged: "As often as one plate is caused to vibrate, just so often will the others vibrate, caused by the break or the weaking of the electrical current." If by amendment it was intended to claim the single-pin transmitter for the production of any sound, then it would appear, on reading the amended specification, that Berliner intended to transmit speech by a composite operation of weakenings of the normal current, and breaks of the current. That breaks were to occur in the operation appears from other portions of the amended specification, thus:

"The operation of my invention is as follows: If a circuit of electricity of ordinary strength is made to pass through the plate and the screw across the point of contact, * * * the whole amount of electricity will not be able to pass quietly over the narrow point of contact, and the consequence will be that it will accumulate to a state of tension on both sides of the contact, and the passing over of the current at the point of contact will be so violent as to shake the plate off from the screw. The shock will be particularly strong at the setting in and at a sudden ceasing of the current, when a cracking sound will be heard from the plate, but a weakening of said current alone can also be observed by making for example a connection within the same current by a wire and the blade of a knife. When scraping the wire end over the blade of the knife, this scraping is distinctly audible on the plate. Here the current is never entirely interrupted, yet the minute elevations and cavities on the blade caused by the structure of the steel, and which again cause minute alterations in the intensity of the current are sufficient to shake or vibrate the plate with varying intensity, thus rendering again the same peculiar scraping noise."

This is followed by the language which we have above quoted from the specification. Pages 999, 1000, 109 Fed.

The language here employed, and the figure by which it is illus-

trated, have primary reference to a receiver, and not to the transmitter; and this supports the contention of the defendants that the principal invention which Berliner sought to cover was the receiver. If, however, this language is applicable also to the transmitter, and if the passing of the current at the point of contact would be so violent as to shake the plate off from the screw, it is apparent that a true copy of the sound waves could not be made upon the line. This would account for the failure of the single-pin instrument as a speech transmitter, and show why Berliner had recourse to the double-pin instrument. The absence of any specific amendment stating that Berliner contemplated speech transmission with the single-pin instrument is a strong indication that he did not intend on August 8th that his amended application should be construed as for a speech transmitter. It is apparent that the apparatus with the double pin completely embodies the single-pin instrument. Berliner has stated in his original application all that he could accomplish with this apparatus. He also testifies to his failure with it. When he strikes this out, he strikes out all claim for the transmission of speech. Further amendments were made on September 8 and 14, 1877. That of September 8th added a carbon contact, afterwards canceled. But after these amendments the application still described in the original language the composite operation of weakenings and breaks. As Berliner's novelty is said not to reside in the apparatus but in the mode of operation, this is the vital point. It is of little consequence that the apparatus is shown, if it is not shown operating in the manner described in the patent. The rewritten specification of October, 1877, still preserves a description of the composite mode of operation. with a new claim for the single-pin instrument operating "by either altering or disconnecting said contact at each vibration." Constant contact of electrodes is first definitely claimed and described in the rewritten application of September 1, 1880. At that date the invention had been in public use for more than two years, as is conceded. I am of the opinion, therefore, that the defendants have established their second defense.

Berliner's June 4, 1877, application, did not describe the invention of the patent in suit and was never legally amended to do so. Assuming, however, that by the August amendment the application became sufficient to support the patent, and that such amendment might be made under proper circumstances, we have still to consider the validity of the grounds upon which the complainant claims the right to amend. There can be no doubt that Berliner had the right to drop out any one of the inventions contained in an application whereby he sought to patent several inventions. That Berliner had the right to drop out claim 4 for the double-pin instrument, and also such parts of the specification as related solely to that instrument, is clear. The question is whether Berliner had also the right to drop out portions of the text which relate solely to apparatus which he retains in the specification, and thereby change or enlarge what remained. The plaintiff's brief says:

"His amendments simply withdrew from the specification another invention which had proved practically useless, and incidentally canceled statements in the description of that invention," etc.

This is wrong. Inspection of the document disproves it.

There is quoted by counsel, also, the letter of Commissioner Simonds to the secretary of the interior, dated December 13, 1892:

"These words describe and claim something which is separable from the main part of the instrument, an addition to what was shown in Berliner's caveat, and they embody an erroneous conception of the natural action involved. The tyro in electricity knows that now."

Referring to the amendment of August 8, 1877, which struck out the passage in question, the commissioner is quoted as saying:

"In making that change Berliner had done two things. He had canceled the description of an unnecessary adjunct. * * * He had canceled an erroneous statement of the natural mode of action involved."

This supports the view that the application was not for the invention of the patent in suit, but stated a wrong and impracticable mode of operation. The commissioner is obviously wrong, however, in stating that "these words describe something which is separable from the main part of the instrument,"—"an unnecessary adjunct." This is a main part of the instrument, and of the description of the single-pin instrument. It is erroneous to state, as counsel do, that the words are "words of the specification that describe the double-pin instrument." The entire passage upon which the defendants rely relates solely to a statement of the incapacity of the single-pin instruments, and of the reasons therefor. Following this is a distinct description of the double-pin instrument, and there is no confusion between the two. It is separable from the rest of the document by cutting it out bodily, but in no other way. It is not separable as dealing with a distinct subject. The commissioner was also manifestly in error in justifying the amendment by the rule, "An inventor is not called upon to state and explain the principles of nature involved in the operation of his invention; and, if he does undertake to state them, and thus misstates them, the error is not material;" and, "If the inventor undertakes to state the theory upon which his improvement operates and mistakes it, that fact is immaterial." If an inventor states that he has invented a new machine that works, and theorizes erroneously as to why it works, he may strike out his theory and stand on his fact; and, in construing his document, we may ignore his theory as surplusage and rely upon other parts of the document. But when this inventor states as a fact that he has found that the instrument will not work, and gives an erroneous theory to explain why, when he strikes out his theory he has no fact to stand on. He has not made the instrument operative by discarding his notions as to the reason for the fact that it is inoperative. Strike out Berliner's theory, and his reasons for the inoperativeness of the invention, and there still remains his statement that "these simple instruments will reproduce any musical sound uttered in the neighborhood of one of them, but for the reproduction of special sound, such as speech, they are not adapted";

and these words can be rejected and amended, if at all, on one ground only,—mistake in writing them,—upon clear proof that this was not intended. As a statement of fact they still remain. Jackson v. Brass Co. (C. C.) 72 Fed. 271. They cannot be rejected on the ground that they relate to the double-pin instrument and not to the single-pin instrument, since inspection shows that it is not so. They cannot be rejected as theory, for there are statements of fact that remain after eliminating all theory. They cannot be rejected as an erroneous judgment as to the capacity of the machine, for the machine was old; and if Berliner had not learned its capacity to transmit speech he had made no advance upon Reis, and was not an inventor. If the amendment of August 8th made the application good, it was by enlargement of the description of the capacity of the single-pin instrument by cutting off the express limitation that it was only for musical sounds, and thereby converting the application for a musical transmitter into an application for a speech transmitter. I think that it did not have this effect; but, assuming that the complainant's construction of the amended application is correct, it is manifest that the grounds so far stated to justify the amendment are untenable.

Counsel say, also:

"Suppose it were possible that Mr. Berliner, when he filed the specification of June, 1877, thought that there was or might be some value in the break itself in giving that louder, although harsher, sound; can it be contended that he cannot drop that error out when he discovered the contrary?"

But this is inconsistent with the claim that Berliner's invention was a new mode of operation. So long as Berliner intended to make use of the breaks in the current, he had not invented a constant-contact speech transmitter. Until he had learned that speech could not be transmitted by a structure in which the two electrodes are not normally constantly in contact, he was following Reis; and, as the supreme court has said, to follow Reis is to fail. An erroneous judgment as to the practicability of the composite operation of weakenings and makes and breaks described in the specification could not be amended as "mistake" or "error." Manufacturing Co. v. Ladd, 102 U. S. 408–411, 26 L. Ed. 184.

Even should we be of opinion that rules of law permitted the amendments in question, provided Berliner had in fact made the invention, we should still be obliged to find, as a matter of fact, to support this case, that Berliner was mistaken not as to the capacity of his instrument, but merely as to the phrases employed in the application. We therefore consider as the next question, was Berliner's denial of the operativeness of the single-pin instruments contained in the application of June 4, 1877, a mistake of a scrivener? An examination of this question involves also the substantial question, had Berliner, as a matter of fact, invented a constant-contact speech transmitter before June 4, 1877? The burden of proof on the question of mistake is upon the complainant. There rests upon the complainant the burden of overcoming the strong presumption arising from the terms of a written instrument. "If the proofs are doubtful and unsatisfactory, if there is a failure to

overcome this presumption by testimony entirely plain and convincing beyond reasonable controversy, the writing will be held to express correctly the intention of the parties. A judgment of the court, a deliberate deed or writing, are of too much solemnity to be brushed away by loose and inconclusive evidence." Howland v. Blake, 97 U. S. 624–626, 24 L. Ed. 1027; Insurance Co. v. Nelson, 103 U. S. 544, 26 L. Ed. 436; Coyle v. Davis, 116 U. S. 108, 6 Sup. Ct. 314, 29 L. Ed. 583; Cadman v. Peter, 118 U. S. 73, 6 Sup. Ct. 957, 30 L. Ed. 78; Moore v. Crawford, 130 U. S. 122, 9 Sup. Ct. 447, 32 L. Ed. 878. The doctrine of these cases is fully applicable here. A reading of the original application affords no evidence of mistake. The application does not disclose the fact that Berliner had made the invention of the patent in suit, nor that he intended to apply for it. It contains no evidence that Berliner had discovered that speech could be transmitted with the single-pin instrument. The document discloses no evidence of an intention of Berliner to include in it the single-pin instrument as a speech transmitter. I adopt the statement of counsel for defendant:

"It is impossible to read the specification, with its perfectly lucid and orderly description of three specific inventions, following upon three caveats in which they were described in Berliner's own words, and not perceive that that is all he wanted to describe in his application,"—excepting, of course, the minor inventions of diaphragms.

If this document be read with Berliner's denial of an intention to claim his single-pin instrument as a speech transmitter retained, it is perfectly clear and consistent, showing that he intended to cover a variable-pressure receiver, a sparking and recording receiver, a make-and-break double-pin speech transmitter, a concavo-convex diaphragm, a perforated diaphragm, and the two single-pin instruments for the transmission of sounds other than speech; or we may interpret it as proving an intention to claim the single-pin instrument as a musical transmitter. On the contrary, if we read it according to the complainant's contention that it was intended to cover a single-pin speech transmitter, the whole document is thrown into inconsistency and confusion. It is obvious that the statements concerning the single-pin instrument and its capacity are such as could have come only from Berliner himself. No scrivener would have volunteered such statements. No scrivener would have volunteered such reasons in support of the statements, nor illustrated them by references to drawings. The alleged mistake does not relate to a matter of form. The statement is of the substance. If there was mistake, it was in the erroneous opinion held by Berliner, and not in any expression of his beliefs or opinions. The word "error" is used by counsel in a double sense to signify: First, a mistake in expression; second, a mistaken belief. There are two distinct contentions, which should not be confused. We will consider later the contention that Berliner had made the invention of the speech transmitter of his patent, even though he believed on June 4, 1877, that his single-pin instrument could not transmit speech. There is no express reference to the capabilities of the single-pin instrument as a speech transmitter, although, had he

made the invention, Berliner could not have failed to state first and principally what he had accomplished with this instrument in the transmission of speech. Had this invention been made, had the adequacy of this means been proved, it is highly improbable that he would have made a claim for the double-pin instrument, and a mode of operation which was a reversion to the theory of Reis; or, at least, was intermediate between the constant-contact method of Bell and the current-breaking method of Reis. Berliner testifies that the two inventions of the "variable-contact transmitter" (as he terms it) and the contact receiver, consisting essentially of a diaphragm in electrical contact with a pin or screw, were meant to be covered by claims 1, 2, and 3 of the said application. I am of the opinion, however, that claims 1 and 2 were not intended to describe a transmitter, but merely a receiver; and that claim 3 was merely for two instruments for the transmission of sounds other than speech. It is to be observed that the force which actuates the transmitter is the force of the sound waves; yet claims 1 and 2 contain the clause "and capable of being put in vibration by the action of the electric current substantially as set forth." This is a characteristic wholly unnecessary to be mentioned in describing a transmitter. Prof. Wright, however, testifies that the mechanical conditions under which each instrument best performs its functions are also very different; "that, if we have a Berliner transmitter with steel points in circuit with a Berliner receiver also with steel points, and adjust the two instruments with care for the best performance of their respective functions, speech is readily transmitted, received and understood. If, now, without changing the adjustments of either instrument, we speak into the receiver, thus making it a transmitter, and listen at the former transmitter, thus using it now as a receiver, it is found that speech cannot be successfully transmitted and received. Sound is heard, but crude and harsh, with much breaking, and scarcely anything can possibly be understood. These experiments show in a most convincing way that the operations of the forces in the two instruments are by no means identical,—on the other hand, are radically different,—and, furthermore, that the mechanical conditions under which each best performs its function are also very different." If thus appears that the words, "capable of being put in vibration by the action of the electric current," imply an adjustment that would practically incapacitate the instrument as a speech transmitter.

The learned counsel for the defendants have made a summary of the contents of the application which so completely covers that document as to negative any reasonable belief that Berliner's solicitor was mistaken in its preparation. There is no evidence that in the description of the other inventions the solicitor failed to express Berliner's meaning. The descriptions follow the caveats perfectly, and the claims follow the descriptions perfectly, except as to the transmitter of the caveat of April 14, 1877. Omitting that, the description and the claims are clear, complete and exact. The internal evidence of the application is all against the complainant. Berliner testifies as to the preparation of the application, saying

that he had made several distinct inventions and sought to save money by putting them into one application; that he had made one invention described in a caveat of March 29, 1877, for a system of magneto-telephony, which he did not believe valuable enough to include in the specification; that he intended to insert, "first and principally the invention consisting essentially of a diaphragm in electrical contact with an opposite pin, by means of which I could send undulatory currents of electricity corresponding to sound waves by decreasing and increasing the pressure between said diaphragm and said contact pin. This is described in the caveat filed by me April 14, 1877." This statement must be read with great caution. It was made in 1893, 16 years after the event, after continuous controversy in the patent office, and when he is to be considered as an expert. His language is to be given no liberality of construction. If statements of intention made under these circumstances can be of any force as against a written statement under oath to the contrary, yet this statement is insufficient on the ground that it does not meet the point. It is obvious from the specification itself that Berliner did intend to include the single-pin instrument, and to employ "weakenings" as a part of his composite method for the transmission of musical sound. The inquiry is not as to whether Berliner intended to send undulatory currents, but whether he intended to send undulatory currents of the form requisite for speech by the single-pin instrument. In the argument for the Bell Telephone Company (126 U. S. 299–309), Mr. Storrow, interpreting the Bell patent, clearly pointed out that speech is not a necessary result of an undulatory current; that undulatory currents may be used for musical transmission and other purposes. Berliner's evidence does not prove an intention to claim the single-pin instrument operating throughout its entire range of movement without break, to produce an undulatory current of the form requisite for speech. Before the board of appeal, counsel for Berliner argued: "Can it be discovered from any part of the [specification] that the inventor meant to employ variable pressure as an element? For if he meant to employ it at all, that is enough." Counsel also refer to "variable-pressure periods of transmission," with intermediate breaks. Berliner's testimony may mean only that he intended to send undulatory currents in periods between his intended breaks, or that he intended to send some undulatory currents having "nothing of the nature of each wave and the shape of their curves." The argumentative character of Berliner's testimony will be observed upon reading it. It is entirely reasonable to suppose that Berliner, when he gave this testimony, was of opinion that he did intend to employ undulatory periods as a part of his method of operation in connection with the makes and breaks, and that he reasoned that, as he intended to employ these, he intended his instrument for the production of an undulatory current and was entitled, therefore, to credit for the general invention of an undulatory current transmitter which would include speech transmission, though he had not accomplished it. Though this is erroneous reasoning, it was and is the reasoning of counsel, and may fairly be attributed to Berliner. Testimony as to

an intention existing 16 years before is of very slight weight at best, even when in direct and positive form; but when it may be based upon an "interpretation," and is equivocal in expression, it can have no force against a sworn statement in writing.   It is claimed that mistake arose from speedy preparation by an incompetent solicitor's clerk, and because this clerk had difficulty in understanding Berliner (who was a foreigner) on account of his imperfect accent.   The charge that this statement appears in the specification through any fault of this clerk I believe to be unjust and untrue.   It is certainly not proven.   Berliner applied to a solicitor on May 13, 1877.   His application was sworn to on June 2, 1877, and filed on June 4, 1877.   He was turned over to Coombs, a clerk. Berliner says, "He made copious notes, and I remember giving him a few notes of mine."   Coombs, the clerk who wrote the application, stated that he got explanations from Mr. Berliner previous to finishing the rough draft of the specifications; that they had an imperfect model or instrument, helped out with rough sketches and explanations; that at the time of drawing the specifications he had a general knowledge of electricity, but very little knowledge of speaking telephones; that Mr. Berliner's telephone was the first one he had ever seen or handled; that he found it rather difficult to understand Mr. Berliner, on account of his imperfect pronunciation, and, further, "because the subject was strange to me."   The testimony as to the actual fact of mistake is remarkably meager.   Nor is it clear as to the amount of time spent in preparing the specification. Berliner testifies to a hurried examination of the rough draft of the specification, but that he did not read the final draft.   That there was a mistake, we have no other evidence than the vague statement of Berliner.   Coombs testifies to no mistake.   There is evidence that Coombs was furnished with notes and explanations.   No evidence is offered as to what those notes were, nor as to when they had been prepared.   Berliner himself was not uneducated, but a man of intelligence and of unusual skill and facility in the use of language, and fully competent to have prepared complete instructions to Coombs.   He had formerly written caveats by his own hand, viz. one of March 29, 1877, one of April 14th, one of April 30th, and one of May 9th.   In the summer or fall of 1877 he himself drew an application for patent No. 199,141, which is in perfectly good form, and conducted all the proceedings himself.   The evidence as to speed in preparation of the application by a solicitor ignorant of the subject is evidence of the completeness of the instructions given by Berliner to Coombs.   There is no evidence as to whether the caveats or copies were in the hands of the solicitor; but the application follows closely those caveats, and shows no error of Coombs in respect to any other invention.   In fact, the only direct evidence of mistake is Berliner's own testimony.   Berliner does not testify that he instructed or informed Coombs that he had found that this instrument was capable of transmitting speech; nor does Coombs testify that there was any information offered to him as to the capabilities of the single-pin instrument for speech transmission.   It certainly has not been made to appear that any mistake was made

by Coombs in transcribing or putting into form any fact or statement communicated to him by Berliner. Coombs did his work thoroughly and accurately as to other inventions. Presumably he did so as to this. Berliner does not testify that he gave to his solicitor any documents inconsistent with the specification as filed. He does not state that any specific phrase in the document differs from what was stated by him to the solicitor. He does not state that he did not himself write or authorize the passage in question. He does not state that it was his intention to describe in his application a speech transmitter competent for the production of sounds without make and break. He is not called upon to deny categorically that any specific statement made in the specification was authorized by him. It was the duty of the complainant to prove in detail, and to the best of its ability, just what the mistake was, and how it occurred. Counsel say, merely, Berliner was a German, his solicitor was incompetent, the application was hastily drawn and hastily read. They do not prove what the mistake was. They do not prove that Berliner did not fully authorize the statement that the instruments were not adapted to transmit speech. Expert interpretation is no substitute for testimony as to facts. The oath of Berliner to his application completely overcomes his vague and uncorroborated oral evidence as to the actual fact of mistake. It would be contrary to the rules of law to allow a sworn statement to be swept aside by incomplete, loose and inconclusive evidence of this character offered by the party whose duty it was to produce all procurable evidence on this point. Berliner, however, has not only the burden of proving that mistake was made, but also the burden of accounting for his failure to discover it. If mistake was made, it was on June 2d. It was not discovered until August. We find, however, in the conduct of Berliner immediately after the filing of the application, evidence that this was no mistake. On June 27th, more than three weeks after the filing of the application, an amendment was made relating to the double-pin circuit breaker. On July 14th another amendment was made relative to the double-pin instrument and to the air-discharge instrument, and on August 8, 1877, the double-pin instrument was stricken out. From June 4th to August 8th there stood on the files in the patent office a complete denial of the invention now claimed, and Berliner was examining and amending his specification in relation to the double-pin instrument, and during this period failed to discover any mistake. He attempts to account for this, saying that he had a badly copied letter-press copy of his specifications, "but in the course of time I would now and then, by fits and starts, pick up this letter-press copy, open its pages in a haphazard fashion, and then I would read passages of the specification. In that manner I would discover parts or passages which did not seem to sufficiently express all I meant to say, and all that I had thought I had communicated to Mr. Coombs. After discovering such deficiencies, I would go to Mr. Norris' office and ask that the objectionable portions be amended or that additions would be made, which was done by Mr. Norris. At another time this would be repeated. I would come across another pass-

age which I thought needed amending, and I would again go to Mr. Norris to have it amended; and in that way the number of amendments referred to is accounted for." Not one of the amendments made by Mr. Norris up to August 8th bears this out. The first amendment of June 27, 1877, contains no corrections, but an additional description of his make-and-break double-pin instrument, and a new claim for the bent spring. The second amendment of July 14th substitutes the terms "spring made of steel or other metal" for the words "steel spring," and there is contained an additional statement, not a correction, in reference to the air-discharge instrument. On July 27, 1877, is another addition, and not a correction, concerning the air-discharge instrument. No one of these actual amendments corroborates the testimony of Berliner that he discovered objectionable matter in the expressions of Coombs, and therefore made amendments. These amendments, on the contrary, contradict his testimony. It is entirely improbable that these passages in the original draft could have escaped the attention of a man so skillful in the use of the English language and so intelligent as Berliner; that he could have examined the document for the purpose of making the specific additions that he did make; and that he could have overlooked the denial of the very essence of the invention which he claims. If there is any degree of probability in this statement, the preponderance of probability is so strong against it that this evidence must be rejected upon the ground of its weak and inconclusive character upon the issue of mistake. He testifies that his first discovery of the error of the section dealing with the secondary pin, double make-and-break operation was in the early part of August, 1877; that, happening to pick up the copy of the specification, he immediately noticed "that Mr. Coombs had mixed the matter up considerably, and that the passages referred to did not express what I had invented, and in fact misrepresented it. At first, I thought I would amend this part of the specification so as to make it read right and convey the correct meaning, such as I had laid it down myself in the caveat of May 9, 1877." He then testifies that he had by that time concluded that the double-contact make-and-break instrument did not amount to much, and resolved to strike out the whole matter relating to it. It is apparent, however, that even then, when he learned of this vital error, he did not change the conception of a single-pin instrument operating as a transmitter by make and break, for his amendment of August 8th still left the statement that the break or weakening of the electrical current was the method of transmitting sound. Prior to any amendment in which, by any liberality of construction, we can find a constant-contact speech transmitter, there appeared the Philadelphia Press article, and Edison filed his application of July 20, 1877, for patent No. 474,231. Assuming, however, that Berliner's testimony is to be interpreted as meaning that he did intend to describe and claim the single-pin instrument as a speech transmitter, it can have no force against his written statement unless corroborated by other evidence. Unfortunately for the complainant, the only evidence in this case as to any success in experi-

ments comes from Berliner himself. The two other witnesses produced to testify on this subject both say that at the experiments attended by them no speech was transmitted. Berliner testifies, however, to the presence of several other witnesses at other experiments, but the witnesses are not produced or accounted for. The testimony of these two witnesses is corroborative of the statement made in the application that the single-pin instruments were not adapted to the transmission of speech, and the nonproduction of the other witnesses is a strong fact against the complainant.

We will consider, however, the contention of the complainant that, as a matter of fact, Berliner had made the invention before June 4, 1877. What did Berliner accomplish in speech transmission prior to June· 4, 1877? He testified that he procured a copy of Bell's patent of March 7, 1876. "I studied his patent over and over again, and it became deeply impressed on my mind." A statement of the history of his invention was made by Berliner in Telephone Interferences, and was sworn to on April 12, 1879. In this he says: That he commenced experiments in January, 1877. Being in a telegraph office, an operator explained to him the importance of pressing down the Morse key firmly in order to insure the prompt operation of the sounder. That it then occurred to him that, if a variation of contact pressure between the circuit-closing key and its rest could produce a variation in the current, then a varying pressure between the points of contact could be obtained by the vibration of one or both of them imparted to them by sound or sound waves in the air in their neighborhood; that he constructed apparatus, and proved by a galvanometer that changes of the current could be produced. He stated also that he made experiments on March 4, 1877, and that "a person at the receiver heard sounds when I spoke against the diaphragm of the transmitting apparatus, but could not generally make out the words I spoke"; also that on April 12, 1877, using apparatus consisting of two single-pin instruments, "upon singing against the diaphragm of one of the instruments the tunes could be heard distinctly at the other, and in speaking my voice would be recognized, and the persons listening said they understood what I said." He does not, in this document, state that he himself heard the instrument transmit a word. In 1893, 14 years later, Berliner testified in the case brought by the government for the cancellation of the patent, and gave the names of the persons present at the experiment of March 4, 1877,—Simon and Gustave Oppenheimer. Simon Oppenheimer testified concerning this experiment, saying:

"Berliner and my brother went upstairs, and I remained on the lower floor, and he first whistled into the instrument, and I heard that,—heard his whistling; and then he sang, and, after trying that several times, he tried talking. I could distinguish one from the other,—change of voice,—but I could not make out any words."

Whether the witness means change in Berliner's voice, or change of voice from Berliner to his brother, is not clear. The other person present has not been produced or accounted for. The evidence of Oppenheimer throws light on the meaning of Berliner when he

says in his preliminary statement that a person could not generally make out the words that he spoke. Taking these statements together, the proof is that no words were heard on March 4, 1877. Berliner in 1893 testified also to the experiment with two single-pin instruments in April, 1877, referred to in his preliminary statement. But a single experiment was made with this apparatus before the writing of the caveat of April 14, 1877. The preliminary statement and Berliner's evidence refer to this experiment, though in the preliminary statement the date is given as April 12th, while in the oral evidence it is given as April 11th. The second single-pin instrument was first constructed on the 10th of April. He says:

"On the next morning, before going to the store, I tried a practical experiment from my room to the room downstairs, and made the ladies of the house listen. They were very greatly surprised when I transmitted, as I always did for the purpose of amusing them, by means of interrupted currents. They heard the tunes loudly all over the room, and when I made them listen close to the apparatus, and transmitted by variation of pressure. they reported to me much better results than they had previously heard in other experiments, and they also thought that it was very wonderful indeed. They recognized my voice, and got familiar sentences now and then. It was very difficult to adjust the apparatus. I had to run upstairs and downstairs continuously, both for adjusting the transmitter and receiver. The current would heat the contact; the plate would bulge off a little and get out of adjustment: but we did get quite good results. I immediately prepared, on the evening of the same day, a caveat describing what I had. I made a clean copy of my rough draft on the 12th, swore to it on the 13th, and filed it on the 14th."

He testifies, also, to a practical experiment, the date of which is not given:

"My listeners reported to me that when accidentally, as it happened very often in those experiments. the current was interrupted, they heard that familiar buzzing,—the familiar musical sound they had heard before; that between such sounds, however, they heard a very faint sound, which they recognized as my voice, and that occasionally they thought they understood familiar words or sentences. I then went downstairs to listen for myself, and I found the same result when some one was speaking or singing upstairs."

He testifies that:

"I then for the first time noted the very great difference in the character of the sound emanating from the reproducer. The quality of the sound when the current did not interrupt at the transmitter was that pure, human quality, sounding perfectly natural, though very far off; but it was entirely different from the buzzing musical sound, that had no admixture whatever of the quality of a human voice, when the current was interrupted. I now and then thought I could make out the words of familiar sentences, but it was exceedingly faint."

He gives the names of persons who had listened at the instruments, namely:

"Mrs. Gangewer, the lady I lived with; her daughter, at that time Miss Emma Gangewer; her son, Mr. Harry Gangewer; my roommate, Mr. William Pribram; and two friends of mine, Mr. Simon and Gustave Oppenheimer, brothers."

With the exception of Simon Oppenheimer, not one of these witnesses is produced, nor is the failure to produce these witnesses accounted for. A single other witness—Adolphus S. Solomons—

testified that "I heard sounds which appeared to come from a violin. I felt sure I heard the violin playing." From his evidence it is apparent that Berliner endeavored to speak through his instruments; but the witness testifies that he told Berliner that he heard no speech, only some sort of a noise. The entire case as to experimental results in speech transmission rests upon the unsupported testimony of Berliner. As counsel says, there are occasions in the world when the paucity of proof in the affirmative is positive proof in the negative. Considering the great importance of establishing by other witnesses experimental results inconsistent with Berliner's express denial in his application, and the entire lack of any explanation of the absence of several witnesses who could testify upon this issue, the presumption is justified that the testimony of these witnesses would be unfavorable to the complainant. If a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable. Graves v. U. S., 150 U. S. 118, 14 Sup. Ct. 40, 37 L. Ed. 1021; Runkle v. Burnham, 153 U. S. 216–225, 14 Sup. Ct. 837, 38 L. Ed. 694; Clifton v. U. S., 4 How. 242, 11 L. Ed. 957. We should also consider the inherent dangers of oral proofs when a witness undertakes to disprove former statements made by him in writing. In addition to this, the principles stated in Re Barbed-Wire Patent, 143 U. S. 275, 284, 285, 12 Sup. Ct. 443, 36 L. Ed. 154, seem to be applicable to the testimony of Berliner, in view of the fact that his amendments were made after Edison's invention of a constant-contact speech transmitter, and after the Philadelphia Press article and the applications by Edison. Upon the whole evidence, I am of the opinion that, according to the strong preponderance of proofs, no one of Berliner's instruments ever transmitted a word of human speech under his manipulation, and that the only results that he ever got were such as are described in the application and attributed to the double-pin instrument. Prof. Brackett testifies:

"I have no doubt that, if he endeavored to transmit speech with the single-pin instrument of the application, which he refers to in the expression 'these simple instruments,' he found that they were not adapted for the transmission and reproduction of special sounds to be a fact. In this his experience would not differ from that of every one who has attempted to transmit speech with the Reis and Regnault apparatus, which as apparatus is identical in principle and organization with that of the application."

This was the fact with Edison, who rejected as useless what Berliner by his application rejected as useless. That a feat of experts has made that apparatus talk proves nothing as to Berliner. The documentary evidence upon this point, to and including June 4, 1877, is the caveat of April 14, 1877; the caveat of April 30, 1877; the caveat of May 9, 1877; the application of June 4, 1877. The latter is by its character most important, being his latest statement of what he had done at the date of his application. This proves that he had not secured speech with the single-pin instrument; that he was seeking to secure speech by make and break of

contact. It shows that he thought that, by this method, with a double-pin instrument he had succeeded in reproducing "a great many special sounds, such as the vowels and others." The application overcomes the evidence as to experiment. Moreover, the fact that he was beyond all question attempting to get speech with a broken current renders it highly probable that he had not got it otherwise.

We will next consider the bearing of evidence as to the capacity of Berliner's instruments. It is proven in this record that Berliner's instruments, under proper conditions and manipulation, and when properly adjusted, are capable of transmitting speech. It may be said that it is highly probable, if instruments constructed by Berliner will transmit speech, that he succeeded in doing so. This argument was presented to the supreme court concerning the instruments of Reis. 126 U. S. 193. It was there argued that to admit that the Reis instrument will speak now, and at the same time to deny that, with all his efforts to that end, the inventor made it speak in his time, had only boldness to commend it. Nevertheless the supreme court rejected this argument, found that he had not, and said:

"The question is not whether the apparatus devised by Reis to give effect to his theory can be made, with our present knowledge, to transmit speech, but whether Reis had in his time found out the way of using it successfully for that purpose." Telephone Cases, 126 U. S. 539, 8 Sup. Ct. 778, 31 L. Ed. 863.

Telephone Co. v. Harrison, 20 Eng. Ruling Cas. 601.

It is curious that the Reis apparatus should be asserted both against Bell and Edison upon the testimony of experts as to its capacity. The present question is not as to the operativeness of the machine. It is a question of Berliner's knowledge; of discovery. The burden is upon the complainant, if it relies upon the present capacity of the instrument as proof of Berliner's knowledge; of his discovery and of mistake, to show, not its present capacity in the hands of experts, but its capacity under the exact conditions under which Berliner was working. Expert experimentation has disclosed the fact that the ordinary Morse key, the Reis transmitter, French nails, and Berliner's instrument can be made to transmit speech under proper conditions and manipulation; but we cannot accept this evidence upon the issue of mistake, for it is not proved that the experiments were conducted under similar conditions. It is a familiar rule of law that experiments, to be of value as evidence on such an issue, must have been made under circumstances similar to those constituting the premises from which the original event is alleged to have been the conclusion. 12 Am. & Eng. Enc. Law (2d Ed.) p. 406; Hawks v. Inhabitants of Charlemont, 110 Mass. 110; Com. v. Piper, 120 Mass. 185; Eidt v. Cutter, 127 Mass. 522; Telephone Co. v. Harrison, 20 Eng. Ruling Cas. 601. The danger of this kind of evidence is apparent if we apply it to the double-pin instrument. Berliner was unable, according to his oral evidence as well as his statement in the application, to get speech with a double-pin instrument. Experts have succeeded in doing

so, and Prof. Wright testifies that, properly adjusted, the second pin "somewhat extends the range of voice intensity for which the instrument can be used"; but this does not disprove Berliner's testimony as to his failure with a double-pin instrument. In like manner, the success of experts with the single-pin instrument does not disprove the statement made by Berliner in his application. The complainant, if it desired this evidence to be accepted as evidence of mistake or of Berliner's knowledge, should have proved, and called to the court's attention proof of, the exact conditions existing at Berliner's experiments. It should then have proved that similar conditions were created in the experiments of experts, and that then the result accorded with Berliner's testimony. Anything short of this is not competent legal evidence to sustain the burden of proof as to mistake, though it might be were the issue merely as to operativeness. The question is not as to the capacity of the instrument, but of its actual performance at a certain time. Berliner's experiments in speech transmission with an instrument having an iron diaphragm were conducted hastily on the morning of April 11th, before he went to the store. It is in evidence that he was accustomed to go to the store at half past 7 in the morning. For the first time he had coupled together two single-pin instruments, and this experiment was the first exhibition of his new receiver. He was embarrassed not only by the difficulties of adjusting his transmitter, but with the difficulties of adjusting for the first time his new receiver. It is to be noticed that there is no evidence of results between April 14 and June 4, 1877. In determining the probability of successful results in speech transmission at this experiment, we should consider also the circumstances immediately preceding the filing of the caveat of April 14th, which clearly show that it was based principally upon what he considered a new phenomenon. On the 8th of April occurred a dramatic and impressive incident, in consequence of which Berliner states, "I became much agitated." On the 8th of April, six days before filing the caveat, late in the evening, he had connected the instrument to the galvanometer, and was connecting two terminal wires for the purpose of closing the circuit.

"It was exceedingly quiet about the house and on the street. In closing the circuit I suddenly heard a noise coming from the diaphragm, which surprised me very greatly. I thought I had mistaken my ears, but, on repeatedly making and breaking the circuit, a distinct and sometimes loud tick came from the diaphragm, and apparently from the point of contact between the diaphragm and the steel ball. That was entirely new to me, and I became much agitated, because I saw immediately that I had here a new acoustic phenomenon, viz. that sound was produced without the aid of electrical magnetism, merely by the current itself. I quickly took the tuning fork which I had in my possession. I wound one of the wire terminals around the shank of the tuning fork, struck the same on the table, and applied the vibrating prongs to the other terminals of the line. Immediately a loud musical sound corresponding in pitch to the sound of the tuning fork came from the iron diaphragm. I knew at that moment that I had made an important addition to my observations, for I quickly perceived that, if the diaphragm could give out a musical sound, it could also reproduce speech, when, instead of an interrupted current, an undulatory one was sent to effect it."

This was the first conception of his receiver,—a new and distinct invention, by which, using the language of his application of June 4th, he could effect the object of producing by a common galvanic current "marked mechanical effects that will be distinctly demonstrated to the observer." Here, then, was a new invention; one not exhibited before, and which was first exhibited to others on the 11th day of April. From that time he experimented only with his new receiver in connection with his transmitter. It is in evidence that the adjustment of the transmitter and receiver is quite different. In the experiments made by the experts it appears that the adjustments were delicate. It further appears that, for the successful transmission of speech, there is a very narrow range in the movements of the electrodes. Prof. Wright has testified that:

"When transmitting speech, the electrodes of a microphonic transmitter are brought together with a pressure which is very light, and which has been determined by experiments to vary within a comparatively narrow range."

The evidence shows clearly Berliner's readiness in applying for caveats upon hasty experimentation. His caveat of April 14th, for the two instruments coupled together, was based upon a single experiment in which his attention was in all probability chiefly engaged in exhibiting the marked mechanical effects that he had discovered how to produce by his new receiver, and which seem to have been the chief incentive to the filing of the application of June 4th. The evidence accords with the views of the defendants' counsel that claims 1 and 2 of the original application were merely for a receiver. The complainant contends that Berliner's invention did not reside in structure; that he reproduced substantially the old Reis apparatus, which can be operated either to break the current or to preserve it unbroken. His invention is said to be a new mode of operation. Proof that he reproduced the old apparatus does not prove that he discovered the practicability of a new mode of operation. He is not entitled, as an inventor of apparatus, to claim whatever may be found to be within its capacity, because his sole claim to invention is based upon an alleged discovery of a new capacity in old apparatus. If he did not discover this, nothing new remains that he did invent or discover. He did not "embody" an invention in a machine until he succeeded in making the machine perform Bell's process upon the current. He no more made the invention by making the machine than did Reis or Morse.

Upon the question of mistake and of the right to amend we have finally Berliner's caveat of April 14, 1877. This document is the chief reliance of the complainant. It may be said that it is practically the complainant's case. It is presented as evidence of mistake in the application. The argument as to the right to amend is based chiefly upon it. It is also contended that it counts as a full reduction to practice. We have to consider two distinct contentions: First, that it is evidence that the application stated what Berliner did not intend to state,—a question of mistake; second, that by writing this caveat Berliner had completed and reduced

to practice the invention of a speech transmitter, "even if he had not known that he could transmit speech, or even if he had believed that he could not." This remarkable contention raises a question as to the effect of erroneous opinion, rather than a question of mistake. If Berliner was an inventor of a single-pin speech transmitter in spite of his belief on June 4, 1877, to the contrary, this would not have prevented him from making the statement that his instrument could not transmit speech, nor would this aid the complainant in showing that he intended to apply for a constant-contact speech transmitter. An invention which the applicant had not intended to include could not be introduced by amendment upon a change of intention. Is the caveat inconsistent with the statement in the application upon a comparison of the two documents? The earlier, from its nature, "does not purport to be an account of a result accomplished, but of a result expected and desired." Rob. Pat. § 448. The latter purports to be a description of a completed invention, the expression of the matured and final opinion of the inventor. This caveat proves that on April 14, 1877, Berliner intended to use the instrument of the patent to alternately weaken and strengthen the current. The patent in suit follows closely the language of this caveat, though it differs in essential particulars. We may assume that it proves intention, and a project existing on April 14, 1877. The existence of this intention on April 14th is some evidence of the existence of a like intention on June 4th. As a matter of fact, however, the document is not conclusive upon the question of constant contact of electrodes. "It does not state that the transmission of the electric force is to be made through a closed circuit, although this * * * is really the principle on which a successful working invention depends." See Telephone Co. v. Maclean, 20 Eng. Ruling Cas. 587. Though it says that the current is to be strengthened and weakened, it does not expressly state that the current must not be broken, but says:.

"Part 6. If the uttered sound is so strong that its vibrations will cause a breaking of the current at the point or points of contact in the transmitter, then the result at the receiving instruments will be a tone much louder, but not as distinct in regard to articulation."

The document affords no evidence of the amount of experimental basis for this statement, or whether it was based largely upon theoretical considerations. It would be obvious, perhaps, that a broken contact could not produce with the same accuracy as an unbroken contact sound waves impressed upon the diaphragm, though it would not be so obvious that the louder and more audible effects were useless for speech transmission, and must be rejected. Had Berliner succeeded in transmitting speech by a composite operation of weakenings and breaks, that method could have been found in the caveat, which refers to a tone "much louder, though not as distinct, in regard to articulation," produced by a broken current. In the brief filed before the commissioner on appeal from the primary examiner's rejection it was stated by Berliner's counsel in reference to this language that:

"Berliner knew that any break would injure articulation, though there might, he thought, be some breaks which would not absolutely destroy it."

This interpretation by Berliner's former counsel is much fairer than that of Prof. Cross:

"The caveat also states that under strong sounds the transmitter would break the current, but that, in so far as it broke, it would become useless for the transmission of speech."

This is unwarranted. The caveat, therefore, does not prove that Berliner had learned that the breaks of contact were inadmissible, produced no articulation, and must form no part of the intended operation, and that in speech transmission he must discard his most conspicuous receiver effects, but suggests a doubt upon this subject. This doubt apparently ripened into an erroneous opinion as the result of experiments which led to the caveat of May 9th, and to the double-pin instrument of the application of June 4, 1877. Whatever was his intention or opinion on April 14th, the document of that date does not displace the statement in the application of June 4th. They are reconcilable on the view that the caveat was the expression of a project formed after hasty experiments which showed only a few variations of current; not Bell's speaking current. But this document does not stand alone. It is merely one of several documents; and it is the general rule that later expressions are of greater force than earlier. We must consider, in connection with the caveat, not only the application, but the other caveats of April 30, 1877, for a circuit breaker, and of May 9th, for a circuit breaker. Berliner's model filed June 4th was based upon this caveat of May 9th, and the application for a speech transmitter follows this caveat. Previous to June 4th, then, we have, as evidence of Berliner's intention, and affecting the question of mistake, three documents; the first, showing an intention to use a weakening and strengthening of the current, but suggesting a doubt as to a breaking of the current; the other two showing most conclusively that between April 14th and June 4th Berliner intended to utilize a broken current. He testified also that immediately before the preparation of his caveat of May 9th he thought that he "had a phenomenon which apparently was different from Mr. Bell's conception of what an interrupted current might do, namely, since he said that an interrupted current could only produce pitch, while I had here something more than pitch,— something of the combination and quality of sound." It was, of course, desirable to use an interrupted current, if possible, and thus avoid Bell's patent. The preponderance of documentary proof as to intention on June 4th would overcome the caveat of April 14th, even if we should regard it as complete evidence of Berliner's intention on that date to preserve constant contact of electrodes. We have also, in addition to the evidence of Berliner's intention prior to June 4th, proof of an intention similar to that expressed in the application existing long after that date. The amendment of August 8th left the description of a composite operation of breaks and weakenings of the electrical current still remaining. The erasure, in connection with the fact that his attention had

been called to the matter, and that he did not change his statement, is evidence that Berliner on August 8th did not intend constant contact as his normal mode of operation. In his oral testimony he states that he thought that he had discovered greater capacity in a broken current than Bell attributed to it. In September, 1877, he issued a circular or memorandum to his co-laborers in science, describing his single-pin instrument, saying:

"Any vibration of sound striking one of the plates will either weaken or interrupt the point of contact, and thereby the current, and will thus cause the other plate to vibrate in unison with the first, reproducing the same sound."

In his substitute specification, filed in the patent office October 27, 1877, he claimed a circuit breaker; and in a subsequent patent, No. 199,141, written by himself and applied for October 16, 1877, he stated concerning his application of June 4, 1877:

"The transmission was made by either breaking the contact or by alternately weakening and strengthening the same at each vibration of sound affecting the plate. The reproduction of the sound was effected by permitting such a current thus consisting of electric waves to pass through a similar receiving instrument. * * *"

The intention expressed in the application, therefore, existed long after August 8th. It is certainly more probable, also, that Berliner intended to follow the later caveat of May 9th than the earlier caveat of April 14th, for the instrument of the caveat of May 9th and of the application has all the capacity of the single-pin instruments, as well as such additional capacity as results from the addition of the second pin. As evidence of Berliner's accomplishment, the caveat is of slight value. It proves what he was trying to do. It does not prove that he had by experiment secured such an adjustment of his apparatus as enabled him to secure results inconsistent with what is set forth in his application of June 4, 1877. Counsel urge that:

"Even in the double-pin instrument [of the caveat of May 9, 1877], which did make and break, the dominating principle was after all, as far as possible, to keep the contact, and to keep it in such a way as to vary the pressure so that, even if there is an intermediate break, yet it is a break which is intermediate only, and takes place, if at all, only between two variable-pressure periods of transmission."

This is inconsistent with the complainant's brief, but if this be true, we have strong evidence that Berliner abandoned the intention of April 14th. Berliner states in his application of June 4th what he could accomplish with the double-pin instrument:

"I have thus succeeded in reproducing a great many special sounds, such as the vowels and others."

If it be said that this refers to the make-and-break method, we may refer to his oral testimony:

"I continued experimenting with this apparatus for a few days, but could not possibly get anything else but these three vowel sounds, and generally only two, and nothing at all of consonants."

This caveat was filed May 9th. Prior to May 13th he had consulted a solicitor, and had a model made at his request, which he took to his solicitor on May 13th. This model embodied both his

single-pin instrument and his double-pin instrument. A certified copy of this model will transmit speech in the hands of experts. Will it now be said that Berliner's failure with a double-pin instrument was because its dominating idea was to make and break? This is inconsistent with the views of counsel on final argument. The simple fact, according to all probability, is that Berliner spoke to his double-pin instrument, adjusted it the best he could in the light of all he knew as to the capacity of the single-pin instrument, and "thus succeeded in reproducing a great many special sounds, such as the vowels and others," which he attributed to the second pin. With this apparatus he had got more than with his single-pin apparatus, probably for the reason that, under expert handling, the best operation of the instrument is when the contact is so weak that breaks are likely to occur with great frequency, and render the instrument impracticable for commercial use. His first approximation to speech was when he attempted to break his current and make contact with the second pin. Berliner, therefore, after experiment, arrived at the conclusion that his single-pin instruments were incapable of transmitting speech. He formulated clear and definite reasons for this opinion. He stated these clearly to his solicitor, who expressed them clearly according to his instructions. He also told his solicitor all that he had accomplished with the double-pin instrument. A drawing was made showing this double-pin instrument, provided with a speaking tube and an ear tube, and the solicitor clearly stated all that Berliner had accomplished. This was his best result. The application of June 4th clearly represents his last opinion, and shows conclusively that he had produced no experimental results to the contrary. Even had this caveat made the express statement, "I have succeeded in transmitting the quality of sound, and I think I have obtained some words," the sworn statement in his application would not be inconsistent with the caveat. It would simply prove the insignificance of his results. There is no difficulty nor improbability in the supposition that, after the full preparation of his caveat, Berliner still had to ask himself the question, "Will it work?" It is in accordance with all the probabilities, with the experience of Reis and of Edison, that he found that it would not.

The complainant next contends that whatever may have been Berliner's opinion as to the capacity of the instrument, and even if he thought he knew that the instrument would not transmit speech, he had yet made the invention of the patent in suit, because the caveat is a complete reduction to practice. As we have already observed, this would still be insufficient; for, in order to amend, he must both have made the invention, and have intended to apply for it. But, as the contention may be renewed, it may be well to consider it. The contention that the caveat of April 14, 1877, counts as a full reduction to practice, irrespective of experimental results, is equivalent to a claim that, had Berliner stated in writing, simply, "Reis' instrument operated by the Bell method will transmit any and all sounds," this constituted a complete reduction to practice, even were Berliner ignorant of the truth of his statement.

109 F.—65

There is inconsistency between this contention and the claim that there was invention in operating the Berliner-Reis instrument by Bell's method. If it was obvious, upon a reading of Bell's patent, and upon learning the capacities of an undulatory current, that the Reis instrument could be so operated as to produce Bell's undulatory current, then there would have been no invention in using the old method with an old instrument. The supreme court, in 126 U. S. 545, 8 Sup. Ct. 788, 31 L. Ed. 993, said, concerning Van der Weyde:

"It is only necessary to say that he copied Reis, and it was not until after Bell's success that he found out how to use a Reis instrument so as to make it transmit speech. Bell taught him what to do to accomplish that purpose."

This raises a doubt whether the mere discovery that the Berliner-Reis instrument could be operated by the Bell method constituted a patentable invention. The supreme court also said:

"With the help of Bell's later discoveries in 1875, we know now why he [Reis] failed." "It was left for Bell to discover that the failure was due, not to workmanship, but to the principle which was adopted as the basis of what had to be done."

The argument that the caveat is a full reduction to practice, irrespective of experimental results, is based upon the assumption that Berliner, as an inventor, must have realized that what he had written down was necessarily true. If so, patentability must be denied on the ground that the caveat was a simple following of Bell. Mr. Storrow argued (126 U. S. 288) as to the operativeness of the Reis apparatus:

"If this were true, it would only show the perfection and the novelty of Bell's new method or mode of operation, which, when applied, would enable that which never had been a speaking telephone to at once transmit speech."

There is force in this argument. The complainant's case as to invention, however, is based upon the contrary assumption, and upon proofs to the contrary. Prof. Cross says:

"There was certainly no sufficient reason to justify a scientific man in asserting that, under the slight change of pressure due to the voice, the variations of resistance correspond to and are approximately proportional to the variations of pressure, and are great enough to yield practical results. This," he says, "was not wholly unknown, but what was known on the subject tended to show that the operation expressed by this law was an impossibility."

How can it be claimed, then, that, aside from experimental results, a mere statement in writing, which was upon its face a statement of something that could be known only empirically, is equivalent to complete invention? Prof. Wright says:

"There is another principle which is utilized in the case of any microphonic transmitter transmitting speech, and that is the proportionality between the variations in the current strength and the variations in the pressure at the point of contact produced by the vibrations of the air caused by articulate speech or other sound. So far as I am aware, this principle of proportionality was not known and had not been utilized for any practical purpose before the time of Berliner's invention as described in his caveat."

The contention that the caveat establishes invention because in some cases invention may be established by drawings and verbal descriptions fails to recognize the distinction between inventions

dependent upon familiar facts or familiar mechanical principals, and an experimental invention based on the discovery of new facts. A drawing or words may or may not prove completed invention, according to the subject-matter. If common persons guided by common knowledge, or experts or scientific men guided by scientific knowledge, can say, upon reading text or examining a drawing, "This will necessarily work. It accords with what is known,"—then there may be reduction to practice by a drawing or by a verbal description. If, upon reading a document or studying a drawing, scientific men and experts would say, "All that is known tends to show that this is an impossibility, or there is nothing in common experience or in expert or scientific knowledge which justifies this statement without experiment,"—if it will not be believed without experimental verification,—there surely is not patentable invention in the writing down of the project. It is bare hypothesis. The contention is based upon a quotation from the Telephone Cases, 126 U. S. 536, 8 Sup. Ct. 783, 31 L. Ed. 990:

"The law does not require that a discoverer or inventor, in order to get a patent for a process, must have succeeded in bringing his art to the highest degree of perfection. It is enough if he describes his method with sufficient clearness and precision to enable those skilled in the matter to understand what the process is, and if he points out some practicable way of putting it into operation."

As the supreme court held that Bell's description of a process of treating an electrical current was sufficient to sustain his patent, though Bell had not transmitted speech prior to the date of his application, the complainant seeks to place Berliner on a par with Bell as the inventor of an art or process, and thus to avoid by the caveat the effect of the denial in the application, and the imperfection of the evidence as to experiments. But there is no analogy between Berliner's secret caveat of April 14, 1877, and Bell's specification. Bell made a most remarkable primary invention, and described exactly a process based upon a scientific conception,—"a mathematical conception." 126 U. S. 539, 8 Sup. Ct. 784, 31 L. Ed. 991. His patent was "not to be confined to the mere means he improvised to prove the reality of his conception." The Berliner caveat does not purport to describe and does not describe a new process of treating a current, but upon the most favorable construction merely apparatus for practicing Bell's art,—novel not as structure, but as an old structure applied to a new use,—a structure that had failed as a speech transmitter under the efforts of Reis, Edison, and others. It states that the pressure between the plate and the metal ball can be regulated by a thumb screw, but the success of the apparatus is dependent upon the operator's finding out for himself the exact adjustment of each instrument. It is clearly shown by the evidence that to obtain the exact adjustment and conditions necessary for the transmitter is a matter requiring great care and skill, and that the adjustment that is essential for the transmitter is unsuitable for the receiver. If this caveat is now a direction sufficient to a person skilled in the art, Berliner was not so skilled, but an uninformed experimenter. The caveat may be followed as far as its

directions go without success. A feat of experts must be added to what is shown. Prof. Cross says:

"With every microphone there is a certain 'normal pressure,' as it is called, which should exist between the electrodes when at rest, in order to secure good microphonic action. * * * It is a well-known fact that the electrodes of an ordinary microphone transmitter will not operate to transmit speech if they are closely clamped together."

Prof. Wright says:

"When transmitting speech, the electrodes of a microphonic transmitter are brought together with a pressure which is very light, and which has been determined by experiments to vary within a comparatively narrow range."

He says, also:

"I have ascertained by numerous experiments made with a great variety of microphonic joints that for all combinations which are ever practically used in transmitting microphones, there is a certain interval between the smallest pressure and the largest pressure practicable, within which the changes in the intensity of the current are very closely approximate to the changes in the pressure which produce them."

We have already referred to the evidence of Prof. Wright "that the mechanical conditions under which each best performs its functions are also very different." The caveat discloses nothing of all this. It does not prove that Berliner had found out the "certain interval between the smallest pressure and largest pressure practicable" for his transmitter, nor the suitable adjustment for his receiver. It affords less evidence, even, than his oral testimony, and certainly cannot mean anything more. Therefore, when we find that his caveat was based upon a single experiment with the two instruments; that he afterwards made the double-pin instrument, and applied for a patent upon it, and declared the uselessness of his caveat transmitter,—it becomes necessary to conclude that Berliner, as a matter of fact, did not accomplish what he hoped to accomplish; that he stopped where Reis did. And, in the face of such a conclusion of fact, there is no artificial rule of law that makes Berliner's caveat description a reduction to practice. It is merely a part of the evidence,—one of several documents all equally relevant. In Telephone Co. v. Harrison, 20 Eng. Ruling Cas. 602, it was said:

"How can we, dealing with a subject like electricity (a subject which at the present moment is so obscure that I am not sure that scientific men would pledge themselves now to the exact way in which the transmitter works), and going back six years into the twilight of the discovery, say that an instrument which presents no means of knowing what the best adjustment was, is the same instrument as that which does."

How can we say that Berliner's caveat, which shows substantially the Reis apparatus, and does not show what experts say is essential to make it transmit speech, is the equivalent of a reduction to practice? The evidence of the experts as to the absolute necessity for a loose contact accurately adjusted seems to establish the insufficiency of Berliner's caveat to prove that he had discovered any of "the remarkable properties of a loose joint." So far as efficiency and difference in electrical effects are concerned, the caveat is silent. Berliner's problem, after receiving from the Morse key a

suggestion, and after finding by galvanometer tests that a variation of current could be produced, was still before him. He had no theoretical grounds whatsoever upon which he could state anything more than that some variation of the current might follow. Upon the evidence of complainant's experts, it was a known fact that changing the firmness of contact of solid electrodes would change a current, and the problem was to find whether it could be changed in a sufficient and proportional amount by the vibration of a diaphragm. If Berliner did not by experiment discover this, his pretensions are baseless. Berliner's invention, if he made one, lay in experiment. He was entitled to formulate an expression of what he had found out by his experiments. He was not entitled, either scientifically or legally, to lay a claim to anything more. It was necessary, before the forecast expressed in the caveat was entitled to be called a conception from which invention could date, that Berliner should have found not only that he could produce some variations of a current,—that he could get something of the quality of speech,—but that he should have produced substantial effects that were a demonstration to the ear of the truth of his project. Edison had changed a current with a Reis instrument and produced audible effects in 1876. Edison's attempt to operate a Reis transmitter without breaking the current anticipates Berliner's conception, and he had demonstrated that a current could be changed. If this is all Berliner did, if this is all the caveat proves, he is anticipated by Edison's experiments with the Reis transmitter. In Rob. Pat. § 381, referring to inventions which are the result of experiment, it is said:

"The production of a new means by this method is  *  *  *  an inventive act, but at no instant before the experiment succeeds can it be said that the conception of the invention exists in the inventor's mind. Until that instant, it is mere speculation, at most a probable deduction from facts already known; and the same act which reduces it to practice gives to the conception its definite and final form."

This I believe to be sound. One who should read this caveat would find in it nothing self-evidently true or conformable to experience. He would be obliged to take the author's word for it as a statement of fact resting on authority. Counsel contend that the belief of Berliner that he could not transmit speech would make no difference. They say:

"He had invented, described, and pointed out a mode of operation, a method of varying resistance in the circuit by varying pressure, which necessarily does result in a capacity to transmit speech. It is not the mere fact that speech is transmitted which is the thing that is claimed in this patent. It is the discovery and invention of a method of varying resistance in a circuit which is of supreme value, because, whether known to the inventor or not, it will transmit speech and all other sounds, and will necessarily mold a battery current as is necessary to mold it to transmit speech."

Here counsel are claiming for Berliner what Bell's patent, claim 4, covers completely. The only method of varying resistance, whatever its kind, is Bell's,—to vary it by and proportionally to the pressure exerted by sound waves. Berliner, of course, knew what Bell's undulatory current could do if he could produce it. His

problem was either to produce it or to approximate it by a composite operation of breaks and weakenings; but he did not know, merely because he could produce deflections of a galvanometer, or something of quality, that he could produce Bell's speaking current (see 126 U. S. 299, 302, 303) any more than Reis did.

It is here contended, practically, that if Berliner found out that, by pressing together two electrodes, he could change a current, he was entitled to leap to the conclusion that he could produce any and all changes of a current; that he could vary it in the required proportions; and that upon this he became entitled to lay tribute upon all practical experimenters. But the patent law affords no protection to speculators nor to prophets. If the conclusions of fact are sound, and Berliner's caveat—as upon the evidence I am forced to believe—was merely a clever hypothesis reduced to text and drawings, no case could present a more forcible example than this of the necessity of drawing the line between the speculator and the inventor. A failure to draw this distinction, and the apparent failure in the patent office to give to the caveat of May 9th the same force as evidence as that of April 14th, together with the acceptance of insufficient evidence of mistake, has led to the conversion of an abandoned scheme into a patent that has for 10 years been asserted unjustly against the public right. Edison, by countless experiments, succeeded in advancing the art. Berliner's secret caveat would never have given the world a speech transmitter. It was embryonic, inchoate, and rested in speculation. Because of his application of June 4, 1877, the authorities that the complainant's brief quotes against Edison are applicable with full force to Berliner and his caveat when it is resurrected and asserted adversely to Edison. "The law requires not conjecture, but certainty." Coffin v. Ogden, 18 Wall. 124, 21 L. Ed. 821. As skill in language and in scientific method becomes more common, it is easier for speculators to survey and cover the field opened by new discoveries; it is easier to generalize as to what may be done, and to mark out the general lines upon which progress must be made, than to accomplish practical results. But the work of practical men should not be hampered by finding a new, useful, and practical device covered by some patentee who was able to make generalizations applicable to all that might be developed within 17 years from the date of a paper patent. It surely was not the intention of the supreme court to decide, and the supreme court did not decide, that he who guesses is an inventor, if he writes down in a secret memorandum clever guesses or projects which are verified by others. If this is the correct interpretation of the decision, the speculator has only to make broad and expansive generalizations, and await the issue of the necessary labors of practical experimenters. If their efforts fail, he has lost his paper and ink. If their efforts succeed, he may exact tribute from those whose efforts have led to practical results. The complainant's attempt to base the case upon this caveat, irrespective of Berliner's experimental results, involves it in a curious situation. Prof. Cross says, in effect, that what was known on the subject tended to show that

what Berliner wrote in his caveat was an impossibility. Counsel say it was "an invention, * * * until it had been accomplished, of incredible character." It is said that the invention was based upon Berliner's discovery of the availability of solid electrodes to effectively vary the current in the required way. By writing the caveat regardless of what he knew experimentally, Berliner made an invention because what he wrote was true in fact, and therefore necessarily true at the time it was written down. Although on its face an apparent impossibility, Berliner must have realized that what he wrote was true, even if he did not make the experimental discovery. That even if at a later time he became convinced that what he wrote was an impossibility, as it appeared on its face to be, and stated in his application that it was an impossibility, he was an inventor, because other persons have made the discovery that his later statement was untrue, and that his first statement was true, and therefore he was entitled to amend his application by striking out the major part of it, and inserting large portions of his caveat. To make a case, even upon such an argument, it must go one step further, and say that he might amend even if at the time of making the application he had not intended to claim what was in his caveat. The real question is not whether this caveat would have been good as an application for this patent, but whether, as a matter of fact, Berliner had made any discoveries that render it probable that his application stated what he did not intend to state, or that he intended to claim his single-pin instrument for speech transmission. As we have said, if there is an artificial rule of law that makes this caveat an invention, though Berliner did not know it, there is no artificial rule of law that attributes to him an intention to make an application for a speech transmitter when he was of the opinion that he had not invented one. Therefore the contention that the caveat is a reduction to practice, if established, would be insufficient to support the complainant's case. When Berliner filed his application, he left it open to others to discover that speech could be transmitted with a diaphragm and a metal pin. The expert who first succeeded in doing so is entitled to the credit of making that discovery, despite Berliner's caveat. The case cannot, upon any view, be maintained without proof of experimental success. I am of the opinion that this proof is necessary in order to establish invention; but, if this is not so, I think that there can be no doubt that it is nevertheless still absolutely necessary in order to show that Berliner on June 4, 1877, intended to make application for what is covered by the patent in suit. Even after the mind has been conciliated by the course of argument adopted in the complainant's brief, and if a comparison of Berliner's original application and his patent is preceded by the detailed statement of all the circumstances favorable to Berliner, and the argument of experts upon his application, yet, after all this, the conscience is shocked when Berliner's application and his patent are compared; and a shock to the intelligence also occurs when we are told that the clear, specific, and detailed statements of Berliner's application were mistakes of a solicitor's clerk, who was

ignorant of the subject, and therefore must have got all his information from Berliner.

. The patent, then, is invalid: First upon the ground that it issued for an invention which Berliner had not made at the time of the application; and, second, upon the distinct ground that it issued for an invention not disclosed by or claimed in the original application, and not incorporated into it by legal amendments.

The next question affecting the validity of the complainant's title is the defendants' point that the patent in suit is void because of Berliner's earlier patent, No. 233,969, of November 2, 1880. This is known as the "Receiver Patent," and was issued upon a division of the original application. It contains a sufficient description of the transmitter to sustain a claim if Berliner were seeking it. Counsel for the complainant concede this. It is sufficient to consider claim 4.

"Claim 4. A system of two or more telephone instruments in electrical connection with each other, each consisting of two or more poles of an electrical circuit in contact one with the other, either or both poles of each instrument being connected with a vibratory plate so that any vibration which is made at one contact is reproduced at the other, substantially as set forth."

This claim is for two single-pin instruments in a system. Each is a relative part designed for and only useful in a system. They are system parts or relative instruments. In the system, each performs its whole function, and alternately the functions are reversed. We find, therefore, in this claim, the transmitter performing its entire function of producing electrical undulations similar in form to sound waves, and applied to its appropriate use in connection with a receiver. This claim embodies the transmitter completely. Its intended function is in no way modified by the fact that it is united with a particular receiver. It performs with this receiver the same function as with any other receiver. The complainant contends that this claim is for a combination which is an invention distinct from either the transmitter invention or the receiver invention. I am of the opinion that this contention is unsound. As the transmitter is a system part or relative part, it does not constitute a combination in the sense in which that term is used in patent law, to put the system part into a system for which it is designed; to put a relative instrument into its intended relation. This is but application to appropriate use. No third person would have been entitled to a patent for a combination by uniting two of these instruments. There is no invention over and above that which is in the transmitter and that which is in the receiver. A "transmitter" implies a receiver; a "receiver," a transmitter. The fourth claim, nevertheless, is not invalid, because Berliner was the inventor, we may assume, of both; and he might take a patent with such limitation upon the use of either as he saw fit. He could not, however, take a patent for his transmitter limited to its appropriate use with a single receiver, and subsequently take out a patent that would enable him to control any and all uses of the transmitter, since the latter patent would include the former use, for which he

had already received a patent. It is a valid claim, because, as we may assume for this argument, the elements were novel, and Berliner was the inventor of both. The claim confers a monopoly of the transmitter with a restriction or limitation. The patent in suit confers a monopoly without restriction. The patents are nevertheless both for the "same invention," both in a legal and a practical sense. It presents the familiar case of an inventor taking a patent with an unnecessary limitation. The commissioner has exhausted his power, and cannot afterwards give him a general grant for all uses. The argument that the use of the transmitter or of the receiver alone would not infringe claim 4 is immaterial. It does not prove that the claim is for a third invention, but merely that the claim does not cover all the uses which might have been covered; had the patentee not chosen to take a claim for a restricted use. That the two patents are not coextensive does not affect the application of the rule against double patenting. The patent of 1880 gives Berliner full protection for his transmitter in a particular application to an appropriate use. It is said that in electrical apparatus the word "system" has just the same meaning as the word "combination" in purely mechanical apparatus. Berliner's 1880 specification does not, however, disclose any invention in the coupling of his instruments, but merely elements united without invention. In Palmer v. Manufacturing Co. (C. C.) 84 Fed. 454, it was held that a claim purporting to be for a combination was in fact simply for an application to an appropriate use of what was claimed in an earlier patent, without the development of the inventive faculty in making the application. Though the circuit court of appeals disagreed with the circuit court upon the question of whether or not there was a true combination, and sustained the patent on the ground that there was a true combination, it said:

"The test of identity afforded by a comparison of the claims of the two patents, however, is not conclusive. We must be satisfied further that there are substantial differences, not merely varying descriptions of one invention, or descriptions of a single invention in different applications to use."

There was no disagreement with the views of the circuit court upon the legal proposition that where the difference between two patents was that one was for a specific device, and the other for a specific device applied to its appropriate and intended use, the patents were for the same invention. Palmer v. Manufacturing Co., 35 C. C. A. 86, 92 Fed. 925. See, also, Tire Co. v. Lozier, 33 C. C. A. 255, 90 Fed. 732. That the claim also covers the instrument when performing its functions as a receiver is immaterial. The reference in the 1880 patent to the application for the patent in suit, if intended as a reservation, does not avail. Miller v. Manufacturing Co., 151 U. S. 186, 192, 201, 14 Sup. Ct. 310, 38 L. Ed. 121; Tire Co. v. Lozier, 33 C. C. A. 255, 90 Fed. 745. Without considering other grounds based upon other claims of the 1880 patent, I am of the opinion that, by granting claim 4 the commissioner exhausted the power to issue the patent in suit. I agree with the conclusion of Judge Carpenter upon this point, in U. S. v. American Bell Telephone Co. (C. C.) 65 Fed. 86, 87. On appeal and in the supreme

court, this finding was not overruled as erroneous, but only as unauthorized on a bill by the government for the cancellation of a patent.

We have next to consider the questions arising on the work of Edison. Berliner's amendment of August 8, 1877, must bear the date of filing. The date of the application for the patent in suit was not earlier than August 8, 1877. On this view, Edison's application of July 20, 1877, for patent No. 474,231, is so clearly an anticipation of all that is claimed for Berliner by the complainant, that we need not dwell upon it. Prof. Cross says of the apparatus described in this application:

"I have no doubt, therefore, that the apparatus * * * was in fact what it has universally been admitted to be,—a microphone."

See, also, 126 U. S. 278.

Prof. Cross says, also:

"But, although the apparatus * * * was a microphone in fact, my belief is that Mr. Edison at the date of his application * * * and indeed long subsequently to this, believed that the apparatus operated by variations in the mass resistance of the material employed in the points."

But this, of course, is entirely immaterial. Here is the place for the proper application of the rule:

"An inventor is not called upon to state and explain the principles of nature involved in the operation of his invention." 1 Rob. Pat. § 82, p. 124, note 3.

Disregard all Edison's explanations or notions as to the scientific reasons for the success of his invention,—its success still remains. Edison's application describes and claims the invention; and does not, like Berliner's application, contain evidence that the applicant had not made and did not intend to claim it. Edison's application of July 20, 1877, throws upon the complainant the burden of proving that Berliner had made the invention of the patent in suit before July 20, 1877. This burden cannot be sustained. But if we assume that Berliner did make an invention, and that his caveat of April 14, 1877, counts as a full reduction to practice, the complainant has still to meet the defense of the priority of Edison. It is impossible in this opinion to consider all the contentions that arise on Edison's work, or all the relevant experiments, patents, and apparatus. It is proven, however, that, before the event in the telegraph office that suggested to Berliner the possibility of employing in telephony variable pressure or variable contact of solid electrodes, Edison had been engaged for a long time in experiments to find means to mold a battery current into undulations similar in form to sound waves; that he always used a continuous current and the vibrations of a diaphragm to control the approach and recession of conducting surfaces in constant contact. With various devices he had succeeded in getting some degree of articulation. As early as 1876 he had experimented with a Reis transmitter, and obtained results which he describes as follows:

"Q. Did you succeed in transmitting any words with it at that time? Ans. I cannot say. We generally knew what was coming, and, knowing what was coming, even a Reis transmitter, pure and simple, transmits and repro-

duces sounds which sound almost like that which is being transmitted; but, when it was attempted to transmit something which the receiver did not know, it was very seldom that any word was recognized."

He rejected that as useless. By January 20, 1877, he had thought of applying to the telephone the fact discovered by him in 1873, that carbon placed in an electric circuit and subjected to varying pressure gave rise to remarkable variations of current. At this date he made an experiment which he says "was the first attempt to apply the property of carbon, of varying its resistance by pressure, which I discovered in 1873." This experiment was illustrated and explained by the following sketch and inscription:

"Three platina points don't seem to work any better than one point. Get it very good on a Western Union relay through my teeth, but I think that I could get it better if I had an adjustment to it, for Charley can't hold it steady enough."

Edison testified:

"It consisted of a diaphragm and three platina points immersed in a dish containing loose carbon. The talking, though very poor in quality, was of a sufficient volume that it could be heard through the teeth when an ordinary Morse relay, the magnet of which was included in a circuit, was held against the teeth."

SPEAKING TELEGRAPH.
Jan. 20, 1877.

This preceded what counsel say was Berliner's date of conception, late in January, 1877. It is clear, however, that Berliner's thought in the telegraph office was not a complete conception from which invention can date, but as counsel say, "only an imagination of a possibility based upon analogy." He had merely found a line of investigation,—something worth looking into,—and conception was incomplete until experiment led to discovery. The conception could date only from such discovery. Clark Thread Co. v. Willimantic Linen Co., 140 U. S. 481, 489, 11 Sup. Ct. 846, 35 L. Ed. 521; Rob. Pat. § 381. Before this, even, Edison had made and recorded an experiment embodying the idea from which was developed the successful commercial telephone,—the use of a carbon electrode,—and also constant contact and variable pressure upon a solid. The evidence of complainant's experts proves the importance of this experiment. In order to show that the defendant's carbon powder transmitter infringes, Prof. Cross testifies that variations of current produced by varying pressure on a single contact and on a mass of powder were recognized by Du Moncel and Sir William Thomson as different examples of the same principle, and that "the mass of powder merely furnishes a large number of microphonic contacts." If Berliner is to be given a date of conception "late in January, 1877," Edison, surely, upon the same line of reasoning, must be given an earlier date. His conception was embodied in an experiment, and, following this, it appears that during January, February,

and March, Edison and his assistants were busily engaged in taking advantage of the properties of carbon. This experiment, crude as it was, preceded Berliner's experiments to find whether pressure between a diaphragm and a metallic electrode would deflect a galvanometer. The importance of this experiment is that, if we adopt the complainant's view as to what constitutes a complete conception, we are obliged to give priority to Edison on this experiment alone, in the light of Prof. Cross' testimony as to a mass of powder. By February 9, 1877, Edison had succeeded in transmitting speech "commercially," as he says, by apparatus which we have already illustrated, and upon which was based his application of April 27, 1877, for patent No. 474,230. The defendants' brief says that:

"The question whether Edison or Berliner first made a variable resistance transmitter with solid electrodes, in which the external resistance may be varied, as Bell's patent says, has never been presented to a court until now."

That Edison did produce speech with solid electrodes before Berliner is clearly proven; and the invention described in his patent No. 474,230, applied for April 27, 1877, has as its true date February 9, 1877. This was before the earliest date given by Berliner in his statement in interference, March 4, 1877, when, as he said, "a person heard sounds, but could not generally make out the words that I spoke," and concerning which the person testified that he heard no words. But upon no reasonable view of the testimony of Berliner himself can we give to him a date for the transmission of any words earlier than April 11 or 12, 1877,—the second date given in the statement in interference. If Berliner made an invention, his date is not earlier than April 11, 1877. Before this date, and by April 3d or 4th, Edison had successfully transmitted speech, with other apparatus already illustrated, consisting of a diaphragm and "five vertical springs, each provided with a sleeve carrying a cylinder or button of hard-pressed plumbago fastened to a bar of insulating material. All the plumbago buttons were in contact, and the one at the end rested against a diaphragm. The circuit was complete from the first spring through all the carbons to the last spring." The instrument transmitted ordinary speech perfectly. The complainant's counsel admit that the apparatus of April 1, 1877, is a transmitter involving the conception that the extremely minute vibrations produced by the human voice could produce sufficient pressure of one electrode upon another to change the current, since they contend that it operates by compressing the mass of the second electrode. Preceding Berliner's caveat and his earliest date are at least three operative constant-contact transmitters employing a battery current, using the sound waves as the motive force, and producing electrical undulations of the kind described in Berliner's patent; two of them having solid electrodes, and all of them practicing the variable-resistance method of Bell, and all causing the current to vary proportionally to the pressure exerted at the diaphragm, and also proportionally to the pressure exerted by one electrode upon another; strengthening and weakening the electrical contact according to the movements of a diaphragm, increasing it as pressure increases,

decreasing it as pressure decreases; and all embodying what is said to have been Berliner's radically novel conception, i. e. that sound waves could produce sufficient pressure between contact electrodes to produce an undulatory current.    Many difficulties in this case arise from the complainant's attempt to show that Berliner's patent embodies a conception that was a radical novelty, and a mode of operation that was novel and generic, and to frame a generalization broad enough to include the defendants' devices, by disregarding differences in structure that are so material and important as to render any comparison in respect to practical efficiency or commercial utility out of the question, and that also will escape anticipation by the devices of Edison.    If Berliner's invention was in fact merely an invention of apparatus for practicing Bell's method, and is to be considered merely as an improvement upon the apparatus of Bell and Edison, there is clearly no infringement.

The defendants' "single-contact transmitter" is substantially the well-known Blake transmitter, in which the contacts are of platinum and hard carbon, each supported on springs.    This is described

BLAKE TRANSMITTER.

in letters patent to Blake, No. 250,128, dated November 29, 1881. The contacts are spring supported, so that they move with the diaphragm.    The electrode of hard carbon shown in solid black

in the drawing will demand particular attention.    The second or wall form also employs carbon, powdered and inclosed in a cell, which cell is carried by a leaf spring.    The cell is almost, but not quite, filled with granulated carbon, leaving room for motion and expansion of the particles of carbon.    Two conducting plates or carbon plates form the front and rear walls of the cell.    The movements of the diaphragm are communicated to the front wall of the cell, which presses more or less against the adjacent carbon particles, and likewise presses the numerous carbon particles within the cell into more or less intimate contact.    This is said by com-

plainant's experts to be a "multiple-contact" transmitter. The use of carbon in a transmitter is, beyond controversy, the invention of Edison. Edison was the first to make apparatus in which carbon was used as one of the electrodes; and Berliner, in the course of proceedings in the patent office, disclaimed carbon as an electrode. Prof. Cross testifies that "no metal contacts of which I know could compete with carbon for practical commercial use," and that "all commercial transmitters, as far as I know, have employed carbon as the material of at least one of the electrodes." The carbon transmitter displaced Bell's magneto transmitter, and, under several forms of construction, remains the only commercial instrument. A transmitter with metal electrodes was never in commercial use, the magneto instrument being a better instrument for the practical transmission of speech than a Berliner transmitter with metallic electrodes. The advance in the art was due to the carbon electrode of Edison. Edison's structure, then, is distinct from the structure of Reis or Berliner, and was patentable as apparatus, and was an invention of very great importance. The complainant is attempting to subordinate a great invention.

It is contended, however, that Berliner's invention was generic, and that it both precedes and includes the carbon transmitter. To sustain this contention is essential to the complainant's case, for otherwise the disclaimer of carbon is fatal. Berliner's transmitter and the defendants' transmitters are classified by the complainant's experts under the name "microphone,"—a name which, so far as applied to telephonic apparatus in commercial use, signifies that one of the electrodes is of carbon. The term was applied by Hughes in 1878 to designate apparatus invented by him, having carbon contacts, and designed to render very feeble or inaudible sounds with such intensity that they would become audible. This apparatus rendered audible the tramp of a fly. Prof. Brackett says:

"In some loose sense, the term 'microphone' has come to be applied to any kind of a loose-contact variable-pressure transmitter when employed for telephonic purposes. It is quite clear that in such use of the term it is not descriptively accurate."

He refers also to confusion in discussions relating to telephony likely to arise from the use of this term. As we have to consider whether or not apparatus with an electrode of carbon is similar in substantial respects and in mode of operation to one with electrodes of metal, and embodies the same invention, the constant use of the term "microphone" by the complainant as descriptive of Berliner's apparatus is somewhat confusing, since it involves a begging of the very question that we have before us, and assumes that Berliner's apparatus is substantially similar to that of Edison and of Hughes. It is apparent, however, that Berliner did not anticipate the remarkable discoveries which Hughes disclosed to the world in 1878, and that these discoveries of microphonic facts should not be read into the patent of Berliner. These discoveries were not due to a "conception," but to investigation by intelligent experiment. No preconception could have embraced what Hughes discovered experimentally. Moreover, the apparatus of Hughes did

not include a vibrating diaphragm. Nor should we be misled by the complainant's statement that the instrument described and claimed in the patent "is the only instrument capable of successful use in the transmission of articulate speech by electricity over such distances and in such situations as those for which the telephone is most practically useful and has hitherto been chiefly used." This is true of transmitters with an electrode of carbon, but not of Berliner's instrument. It is true of the carbon "microphone transmitter," but not of the metallic "microphone." It does not follow, because there may be resemblances between the instruments of Berliner, Hughes, and Edison, upon which, in the light of subsequent knowledge, and disregarding questions of practical utility and substantial differences in structure as well as the history of the development of practically efficient apparatus, all, as well as the old Reis apparatus and the Morse key, may be classified ex post facto as "microphones," or because there may be scientific resemblances between them, that the instruments are to be regarded as substantially resembling each other in the practical sense of the patent law, which is governed by considerations of utility rather than by the classifications of science. What, then, was Berliner's invention, according to the complainant? "Berliner's inventions do not reside in the structure involved." This is one of the reiterated propositions of the complainant's brief and argument. It is said that Berliner, "using substantially the old Reis structure, produced a new mode of operation." It is this "mode of operation" which the complainant seeks to monopolize. Identity in respect to mode of operation is proposed as the test of infringement. The complainant's use of the term "mode of operation" requires most careful scrutiny. Counsel say that Berliner's invention may be phrased in many ways; that it may be called an instrument "characterized by its mode of operation," an art or process or method; and that these different expressions are essentially the same. The case of the complainant rests upon the proposition that Berliner invented a "mode of operation" or process or art. It is necessary, however, to draw a careful distinction between the "mode of operation" or modus operandi of an instrument, and a process or mode of operating upon an electric current, and a way of operating a Reis machine in order to preserve constant contact of electrodes. What is Berliner's "mode of operation," art, or process or method? The patent covers no new process to be practiced upon an electric current. The process performed upon the current is Bell's, and is disclaimed. Neither the caveat, application, nor patent refers to any novelty in the treatment of the current. The patent covers no new method of varying resistance, disclaiming varying resistance by sound waves. We have seen the fallacy of contrasting Berliner's "mode of operation" with that of Reis, since by this means the Berliner patent is made to cover again a portion of Bell's field of invention. Berliner's mode of operation must be contrasted with that of Bell's liquid transmitter and of Edison's apparatus. I believe, however, that this fallacy is essential to the complainant's contention that Berliner invented more than a mere variation of

apparatus, operating according to the general method invented by Bell and applied by Bell and Edison. According to the complainant's evidence, when the electrodes of Berliner's instrument transmit speech, there are two joint effects produced by the vibration of the diaphragm: (1) The varying pressure of the electrodes, one upon another; (2) the varying discontinuity of the joint; in other words, the weakening and strengthening of contact. Each of these effects is in turn abstracted and selected by the complainant as the cause or explanation of the variations of the current, and erroneously termed a process, art, or method; and we find either two explanations, or two modes of expressing the same thing: (1) The mode of operation by variable pressure; (2) the mode of operation by varying transition resistance, to wit, the resistance due to the discontinuity of a loose joint.

We will first consider the "mode of operation by variable pressure." The argument follows the language of the claims and specification. Counsel attribute to Berliner the following conception:

"I have a solution. I am going to vary the battery current by varying the resistance of the circuit. How? By varying the pressure between the electrodes by the operation of sound vibrations."

In other words, he says:

"I propose, as a means of solving this problem that many men and many minds have been engaged in, the following solution. It is a simple one. It is a precise one. I will vary the pressure as such between the electrodes which form a part of the circuit. Your honor will, I think, observe the precise and yet the satisfying character of that solution. It seems to me that it is neither too broad nor too narrow."

The complainant's brief says:

"Berliner's idea of using the extremely minute vibrations produced by the human voice to vary the pressure between contact electrodes, so as to produce an undulatory current, was radically and absolutely new."

Prof. Cross states that the operation of the transmitter depends in part upon these facts: First, variation of contact pressure at the electrodes produces variation of electrical resistance; second, that, under the slight changes of pressure due to the voice, the variations of resistance correspond to and are approximately proportional to the variations of pressure, and are great enough to yield practical results. The first fact, he states, was known but not utilized. The second, he says, was wholly unknown before Berliner. Counsel also describe Berliner's invention in the following language: As "the discovery * * * of the availability of pressure, as such, between electrodes, when varied by sound waves, to vary the electric current in the required way." All this is too abstract, indefinite, and vague. It disregards essential conditions, and does not escape anticipation by Edison. If this is a full expression of Berliner's conception or discovery, then it is clearly proven that it was an erroneous and inadequate conception. Unless by the words "varying pressure" is meant varying contact, all this is proven to be erroneous by the complainant's own evidence. A turn of a screw disproves the variable-pressure "mode of operation." It is not true that when electrodes in contact are brought

together with greater pressure, the resistance proportionally decreases; and conversely, when the pressure is diminished, the resistance proportionally increases. If the screw is tightened so that the electrodes are clamped closely together, there will still occur changes of pressure "between" electrodes proportional to the pressure upon the diaphragm, but the current will not be affected as desired. Here we have the best example of pressure "as such," but the current does not change. It is only when the electrodes are placed in loose contact, so that changes of contact occur, and so that the contact is loosened and tightened, that changes of pressure are accompanied by changes of current. Eliminate these changes of contact, and the cause of the variation of the current disappears. The "law of variable pressure" is unsound practically, and logically is misleading. It gives a nominal pre-eminence to that condition which is present both when the instrument is operative and when it is not. It serves to divert attention from the essential condition,—variation of contact,—and from the general resemblance of Bell's, Edison's, and Berliner's modes of operation. Counsel mean by "variable pressure" variable contact. Berliner's variable pressure is a species of variable contact, and variable contact produced by sound waves is the invention of Bell, and was used by Edison before Berliner. Prof. Brackett says:

"With the general statements of Professor Cross as to variations of pressure causing variations of resistance, I have no hesitation in agreeing if the intermediate results be kept in mind, or if need be carefully stated, otherwise not."

He says also:

"I do not conceive that any special function is to be attributed to pressure, merely as such, except in so far as it operates to produce a change in the amount of area in contact, or in the proximity of molecules across which the electric current is made to pass."

Prof. Cross testifies:

"If the instrument is described as working by variation of pressure, that itself is a description that the contact is constant. The instrument could not work by variation of pressure unless there was constant contact."

But the words "variation of pressure" must mean not only constant contact, but varying contact as well. The instrument cannot work unless the contact is both constant and variable. By its "mode of operation by variable pressure" the complainant seeks to cover all transmitters operating upon a battery current by constant but variable contact of solid electrodes, "solid" being the only limitation it contends for as implied in the word "pressure." Is the complainant entitled to hold these defendants as infringers because their transmitters operate by varying pressure or varying contact of solid electrodes, or because Berliner first discovered that the minute vibrations of a diaphragm could produce sufficient changes in the contact of solid electrodes to transmit speech, or because he was the first to invent apparatus embodying the conception that sufficient pressure could be produced between electrodes to vary the current in the required way, or in which the pressure was intentionally weakened in order to cut down the current?

109 F.—66

Edison's apparatus of February 9, 1877, and April 1, 1877, anticipates all this, and shows that Edison, before Berliner, had discovered "that a force so feeble as that of a sound wave" could so vary the pressure between electrodes in constant contact as to produce the electrical undulations required for the transmission of speech. If the variable-pressure operation can be saved from anticipation by Bell through a distinction between a solid and a liquid electrode, it cannot thus be saved from anticipation by Edison. The variable-pressure mode of operation limited to solid electrodes is anticipated by Edison, and the claims limited to solid electrodes are also anticipated. So long as the complainant's counsel persist in pointing out as Berliner's novelty a single aspect of what occurs in the operation of his transmitter, and which occurs in all constant-contact transmitters, to wit, "variable pressure between electrodes," and insist that this is the ground for comparison in determining whether other devices infringe; so long as counsel insist that they need give no further description of the necessary apparatus than "electrodes in constant contact," or "solid electrodes in constant contact," or such vague description of apparatus as may be implied in emphasizing the words "pressure as such,"—so long must they submit to anticipation and to the destruction of their argument by each device that comes within the natural meaning of the broad, general terms whereby they seek to include the defendants' transmitters as infringements. The complainant cannot identify the defendants' transmitters with the complainant's through so broad a generalization as "variable pressure between electrodes" or "variable pressure between solid electrodes"; for, in making these generalizations so broad as to encompass the defendants, they at the same time so broaden the field of anticipation that they include prior devices of Edison. Edison's application of April 27, which goes back to February 9, 1877, showed a diaphragm of sheet metal, in front of which was a plate or disk of suitable material having a conducting surface. He says, "I found that a disk of hard rubber coated with plumbago answers well, but a disk of some conducting metal or substance may be employed." He describes the adjustment and operation. There are two alternative adjustments, by one of which the circuit wires are contacted at opposite sides of the disk, when the apparatus is not within the terms of Berliner's patent. Another adjustment shown, however, is one wire connected to a disk, and the other to a diaphragm. This is the arrangement shown in the drawing previously shown in this opinion, and dated February 9, 1877:

"The disk or plate is accurately adjusted to the proper proximity to the surface of the diaphragm, so that in a state of rest there will be little or no current passing from the battery upon the line; but the vibrations that are received by the diaphragm from the voice cause the electric energy on the line to increase and decrease according to the intimacy of contact between the vibrating diaphragm and the surface of the adjacent disk; for if the electric conductors are connected to the diaphragm and disk, respectively, the current that passes will be pulsated and raised or lowered by the intimacy of contact of a surface or by the variable resistance where the conductors are in contact with the surface of plumbago, or other poor conductor of electricity."

Here the resistance of the circuit is varied by diminishing and increasing the surface of contact, by varying the path of the current outside the area of contact, and also by varying the intimacy of contact of the electrodes. Edison testifies to this. There can be no doubt that the inertia and solidity of the second electrode assists in bringing the electrodes into more intimate contact, exactly as in Berliner's apparatus. This is anticipation as to variable pressure. Here, also, is an example of apparatus "in which the pressure is intentionally weakened in order to weaken the current," which Prof. Cross says was unknown at the date of Berliner's caveat of April 14, 1877.

The patent statutes require the patentee himself to claim and define his invention, so that the public may know its rights, and so that there shall not be imposed upon the courts the burden of constructing upon a hearing new claims from the interpretations that experts may place upon language of the most general and sweeping character. It is for this reason that I am of the opinion, as before stated, that the claims of this patent should be held invalid, upon the concessions of the complainant. The court should not be compelled to attempt such an impossible task as that of finding out what kind of a contact is implied in the use of the word "pressure," when all substances are capable of sustaining pressure, and when anything which can be an electrode can undergo a variable-pressure operation. Nor should the court be required to solve such problems as what kind of material is it upon which pressure, "as such," can be developed? and whether the pressure upon an electrode of hard pressed plumbago is pressure, "as such," or, what is the distinction between pressure of electrodes upon each other and pressure "between" electrodes? We have here, in the solid electrodes of Edison, the kind of pressure called for by the Berliner patent, and the exact method of operation called for by the Berliner patent, to wit, "By making the plate vibrate, the pressure at the point of contact becomes weaker or stronger as often as vibrations occur, and the strength of the current is thereby varied accordingly;" and, if the complainant's case is to stand upon abstractions which disregard essential features of the structure involved, it is very clear that the defendants have completely met the complainant's case. Claim 1 and claim 2, the prima facie case, and the "variable pressure" arguments, are rendered invalid by the work of Edison as exhibited in his apparatus of February 9 and April 1, 1877. To avoid anticipation by the devices of Edison, the complainant has been obliged to abandon, practically, its variable-pressure theory, and, it seems to me, has recognized its vagueness and insufficiency, and the necessity for giving a more specific description of apparatus than solid electrodes in constant contact, by developing a second theory.

We have next to consider a second generalization,—the "mode of operation by varying transition resistance." Upon this the complainant seeks to identify the defendants' transmitters with that of Berliner, and to avoid anticipation by Edison, and also to avoid a concession that Berliner's invention was merely an invention of apparatus. The attention is now directed to the second of the joint

effects following the movement of the diaphragm, to wit, the variation of discontinuity; the weakening and strengthening of the contact. The language of the government bill is quoted with approval, and is adopted by the complainant:

"The principle upon which such an apparatus operates is as follows: The discontinuity of conducting material at the point of contact between the electrodes creates a resistance to the flow of current, which resistance is increased by lightness or weakness of pressure between the electrodes, and decreased by closeness or force of such pressure. By increase of resistance in this manner the electric current flowing in the circuit is weakened, and by decrease of such resistance it is strengthened."

Prof. Cross on rebuttal states the theory of transition resistance in the following language:

"When two electrodes are in contact, and a current passes from one to the other, there is a certain resistance to the passage of a current offered at the joint which is constituted by the surface of contact of the two electrodes. It is a resistance of a different character from that of the body of the electrodes themselves, and is independent in its magnitude of the resistance of the material of the electrodes. Its precise cause is not known, but it occurs only when the current passes across such a joint as I have referred to. This resistance is varied enormously by variations in pressure, and practically disappears when the pressure is other than slight or moderate. From the fact that this resistance manifests itself in the passage of the current from one electrode to the other, and that the phenomena relating to it are manifested only at the joining surface of the two electrodes when the current is in transit, as it were, from one to the other, it is very appropriately called 'transition resistance.' Variation in transition resistance is the basis of the action of the microphone. In it, the transition resistance is caused to vary by properly varying the pressure between two electrodes in contact. This is the only mode of operating a telephone transmitter by varying transition resistance which has ever been utilized, or which, so far as has ever been shown, is experimentally practicable."

It is necessary in this case to be carefully upon our guard against confusion by verbal differences. When we wish to say that a contact changes so as to afford a greater or lesser facility to the passage of the current, we may use a different but equivalent expression, and say that the resistance changes. This introduces a verbal novelty, but no real difference. The circuit is continuous when the contact is so close that, so far as the phenomena of the current are concerned, the joint behaves as if the electrodes were unbroken, and is discontinuous when less than the full amount of current passes. Transition resistance "is always dependent upon the presence of a break or joint whereby physical continuity of the contact is interrupted to some extent," as is stated by Prof. Cross. This, of course, is merely descriptive of apparatus. The extent to which this break is lessened or increased determines the action of the current. But this general language of Prof. Cross, descriptive of transition resistance, is applicable to the Edison apparatus of February 9, 1877. Edison's patent, applied for April 27, 1877, contains a very much better description of "transition resistance" than does the Berliner patent. We have already quoted an extract from Edison's patent that shows a resistance to the current which results from an initial adjustment of electrodes "so that in a state of rest there will be little or no current passing." Here is "loose contact" and transition resistance between solid electrodes as de-

fined by Prof. Cross. As pressure increases, the initial transition resistance existing in the apparatus in a state of rest, and due to discontinuity of the joint, is decreased. Edison has shown a much clearer conception of the resistance due to a break or joint or loose contact than Berliner discloses in those parts of his application which were not affected by any alleged mistake of his solicitor. Berliner gives no directions that the initial current shall be less than is able to pass with full contact. The only transition resistance that he contemplates, apparently, is that put in by the vibration of the diaphragm. His transition resistance consists in weakenings of the initial contact. This was the conception shown in that part of the application which relates to weakening the current. His caveat, claim 4, described the operation of the transmitter, "vibrating the plate and diminishing the amount of electricity passing as many times and as much as the vibrations will loosen the pressure of contact." The application discloses no conception of an initial resistance that can be diminished. Counsel have quoted scientific authority for the statement "that the gist of the invention [of the microphone] seems to lie in obtaining and perfecting that which electricians have hitherto most scrupulously avoided, namely, loose contact." This, of course, relates to apparatus. In fact, the evidence of experts upon the subject of transition resistance, and as to the absolute necessity for a loose joint properly adjusted, comes very nearly to the point of proving the insufficiency of the specification of the patent in suit. But varying transition resistance is merely varying contact. The resistance is caused by the discontinuity of conducting material, or by the joint, which must be loose. To change the resistance we must change its cause,—change the discontinuity. To change the discontinuity is to change the continuity; that is, to change the contact. This follows from a mere interpretation of language. The experts for the defendants prove that in all transmitters the variation of current depends upon variation of contact. Prof. Anthony says:

"There is no other cause of variation of the contact resistance, except variation in the area of contact, or variation in the proximity or what I have called 'intimacy of contact,' between the particles."

Prof. Cross does not deny the evidence of the defendants' experts, but says:

"I believe that it [the change in resistance] does depend upon the proximity of the electrodes, and so upon the proximity of the particles of these. I know of no evidence to show that it depends upon the area of the electrodes in contact. I don't know anything about the number of particles in contact, and I don't believe that any one does. Very likely variations in the transition resistance may depend upon this; it being, as I have said before, a plausible hypothesis, though an entirely unproved one."

But, for the purposes of this case, we are obliged to hold that the defendants have shown by a preponderance of evidence that varying transition resistance does depend upon changes in area and intimacy of contact. Upon his whole evidence, Prof. Cross practically concedes it. Prof. Cross was asked:

"xQ. In the case of two solid bodies constituting a loose joint in an electric circuit, is it your opinion that varying pressure between them does not

vary the area and intimacy of contact of the two electrodes? Ans. It is not my opinion. I believe that it does. xQ. Is it your opinion that such variation in intimacy and area of contact of such electrodes does not cause variation in resistance? Ans. I believe that variation in intimacy of contact, by which I mean simply that change which takes place when two electrodes are subjected to pressure, whose character I do not pretend to determine, does produce a variation in resistance. Whether variation in area of contact produces a sensible change or not in an ordinary microphone, I cannot say. Of course, theoretically, any change in the area of contact would be expected to produce some change in the resistance, but whether this is present to any material extent in the ordinary action of the microphone, I cannot say."

Prof. Cross finally says:

"The actual cause of the existence and of the law of variation of the transition resistance has never been certainly proved."

Complainant's counsel and experts attempt to distinguish the prior apparatus of Edison having solid electrodes by saying that it was Edison's intention to vary the density of the plumbago by mass compression, and to vary the area of contact as distinguished from the intimacy of contact. But no sound legal distinction can be based upon an assumed or expressed intention of Edison. The distinction must be made as to actual apparatus, and its actual manner of changing the current. Rob. Pat. § 82; Eames v. Andrews, 122 U. S. 40, 55, 7 Sup. Ct. 1073, 30 L. Ed. 1064. When counsel, upon the supplemental brief, say that Berliner's method is different from that of merely changing the surface area of contact, and from that of merely changing the molecular condition of one part of the circuit, they assume without sufficient warrant that Edison's apparatus did in fact so operate. They are "guessing at what occurs between the electrodes" of Edison. Both sides agree that this should not be done. Edison, before Berliner, was applying to the telephone the fact that when carbon was pressed a remarkable variation of current followed. If he did say that he had discovered that plumbago had the property of changing its resistance under pressure, it does not follow that he thought that all the changes took place in the interior of the second electrode. If he thought that the instrument operated in part by changes in the conductivity of the material of the circuit he had also conceived of cutting down the current by weakening the pressure so that a small amount of current would pass on the initial adjustment, and a greater would pass as the pressure became greater, and the contact more intimate. But more than this, he had made the instrument and described the mode of operation of the Berliner patent. His evidence is that he employed varying "intimacy of contact" to vary the current; and his patent, applied for April 27, 1877, says so. But the complainant's experts do not avoid anticipation by Edison by limiting Berliner to transition resistance; for Prof. Cross says of Edison's apparatus of the application of April 27, 1877:

"If, however, the transmitter was purposely adjusted under very light pressure, so as to operate as a microphone, which, of course, it can be caused to do, with our present knowledge, though ineffectively, the test circuit gave evidence of microphonic action."

But Edison describes an adjustment under very light initial pressure both in his application and in his sketch of February 9, 1877.

Another distinction upon which the complainant seeks to avoid anticipation by Edison is the evidence of Prof. Wright that there is no sensible microphonic action in the apparatus of the patent No. 474,230, of April 27, 1877; and of Prof. Cross, that with that instrument so adjusted "as best to insure the cutting in and out of resistance, * * * no material microphonic action need be present; and, so far as I can ascertain from careful experiment, no microphonic action is sensibly present in its operation." It is here conceded that speech can be produced by solid electrodes without microphonic action. But absence of "microphonic effect" would not save a defendant from infringing the patent in suit, and does not prevent anticipation. The patent is not limited to electric undulations that manifest microphonic action. It affords no basis for any discrimination in respect to quality of electrical undulations. Neither the specification nor the course of evidence in this case will permit the patent to rest upon differences that an expert ear may detect between undulations similar in form to sound waves. Upon Berliner's own evidence, it is apparent that he had not reached the point of discriminating between the quality or efficiency of tones produced. There is no evidence that such microphonic effect as may be produced by Berliner's metallic electrodes is of the slightest practical importance upon a comparison of his apparatus with the prior apparatus of Edison, or that it made any advance over the magneto instrument. Berliner was not the discoverer of any improved effects demonstrated to his ear. But this distinction is of little practical importance for the further reason that "transition resistance," localized at the contact of electrodes, and microphonic action, were in the Bell mercury,—plumbago transmitter. Prof. Cross says:

"If we immerse the plumbago more deeply, and exclude the immersion, varying operation in this way, it is possible to transmit speech microphonically. That this is the case is shown not merely on theoretical grounds, but also by the peculiar harsh, scratchy character which characterizes a poor microphone * * * with a wire just touching the mercury surface, and particularly if the formation of a meniscus can be avoided, it is possible to transmit speech apparently by microphonic action. In this case the peculiar characteristic sounds of a poor microphone are evident."

He says:

"When plumbago is used with mercury, it is difficult to exclude the presence of microphonic action to a certain extent."

Prof. Dunbar, defendants' expert, made experiments to show that the operativeness of the Bell mercury transmitter is not altogether dependent upon the amount of immersion of the wire, using as one electrode a conducting wire with the surface insulated except at the extreme point. He says:

"With the platinum wire insulated on its sides and presenting a conducting surface only at its submerged end, and using mercury for the liquid, speech was obtained of good articulation, although fainter than when the sides were left uninsulated."

I am of the opinion that the defendants have proven that Edison is a prior inventor of the invention of the Berliner patent, even if we assume that it bears date June 4, 1877, and rests upon the caveat of

April 14, 1877, and that Edison anticipated Berliner in the construction of apparatus having constant contact, variable pressure, and varying transition resistance. But it is not at all necessary for the defendants to prove that Edison was a prior inventor. This case might well be disposed of on one short ground, to wit, the variable resistance of Edison's apparatus is an invention distinct from the variable resistance of Berliner's apparatus, and the method of operating upon each kind of resistance is Bell's. The carbon transmitter used by the defendants is the invention of Edison, and an invention substantially distinct from that disclosed in the Berliner patent; and whether it preceded or followed Berliner's caveat or application is immaterial. The thought that the Reis apparatus might be made to perform Bell's process upon a current cannot be regarded either as a conception that was radically novel, or as an intellectual solution of the practical problem of speech transmission. According to the view of the supreme court, Bell taught Van der Weyde what to do in order to use a Reis instrument so as to make it transmit speech. 126 U. S. 545, 544, 542, 8 Sup. Ct. 778, 31 L. Ed. 993, 992. Edison, in 1876, had this thought, but its practical inadequacy is shown by the fact that so skilled an experimenter found the Reis transmitter useless without alteration, though he was able to change the current and produce audible effects. If it has since been found that the Reis transmitter can transmit speech, if it has been discovered that such minute changes of contact as can be produced between metallic electrodes are sufficient, it is this discovery, and not the thought of making and experimenting with apparatus that is substantially the Reis apparatus, which is the substance of the invention of the Berliner patent. The discovery of what can be accomplished with metallic electrodes is not the discovery that is utilized in the carbon speech transmitter. Edison solved the problem in another way. He says:

"I sought to devise a transmitter, or, rather, an addition to the Reis telephone, which allowed one to talk low or to talk strongly, and have the same reproduced low or strongly. I felt certain that when this was accomplished speech could be transmitted and reproduced."

He found that carbon placed between the electrodes of the Reis transmitter makes it a very good transmitter. He thus dispensed with the necessity of employing such changes of contact as are used in the Berliner transmitter, and solved the problem by constructing new apparatus.

Prof. Brackett says:

"The introduction of carbon as one of the electrodes at once resulted in a variable-resistance transmitter which was of practical use, as is universally conceded. The reason for this result, I believe, may be found in those peculiar properties of carbon which distinguish it from other solid conducting bodies, some of which I may specify. While it is classed among the conductors, it offers greater resistance, other things being equal, than do most of the solid metals. It presents a surface which, unlike the surfaces of metals, is characterized by what may be perhaps termed 'fluffiness,' by which I mean its surface presents great numbers of irregularities, so that portions of it rise above other portions, and so present innumerable prominences or elevations fitting it to readily yield to pressure applied by other solids brought in contact with it, so as to produce very great variations in what I will call the 'molecular area,' as contradistinguished from visible area. I mean,

of course, that greater variations of the numbers of molecules confronting an opposing body, which is acting upon it by variable pressure, will be produced than would be produced under like circumstances in the case of a solid metal. This property alone would mark it as especially suitable for use in a loose-contact variable-pressure transmitter. Also the oxidation products which are liable to be formed on the passage of a current are a gaseous character, and so will be at once removed from the surface by diffusion, thereby leaving the surface practically unchanged in character; and again, when a current of electricity passes a carbon conductor, the heat thereby produced diminishes its resistance, and so allows the current to pass more freely. These three circumstances severally and jointly tend to produce a very considerable variation of resistance to the passage of a current, and thereby make the range of action, when small differences. of pressure are applied, correspondingly considerable. Possibly and likely other properties of carbon which are not well understood may conspire to produce the result in question."

Prof. Wright says:

"I have spoken of the large range of carbon. By this I mean that the pressure upon the joints of the electrode may be varied within comparatively wide limits before the vibrations in the current which are produced by the pressure cease to be such as can be practically employed in the transmission of speech. This has an important practical advantage in the fact that the adjustment of the instrument is much more easily obtained by simple mechanical arrangements than in the case of the metals where this range is small."

Edison discovered that carbon alone possessed the necessary range of contact to make a practical variable-pressure transmitter. The peculiar characteristics of carbon have given carbon transmitters the entire commercial field. Edison found that the practical way of turning the Reis transmitter into a speech transmitter was not to invent a mode of operation new over Bell, but to invent the carbon electrode. It is proved that the Bell magneto instrument is superior for practical purposes to Berliner's instruments with metallic electrodes, while the carbon transmitters are superior to the magneto instrument. The carbon transmitter could never have been found in the Berliner patent. It is not the fact that the commercial telephone was developed from a new conception disclosed to the world by the Berliner patent or caveat. Berliner's experiments and Berliner's patent conferred no knowledge as to carbon. It is not disputed that Edison's invention was developed by him independently, and it is also contended by the complainant that his invention was perfected without the conception which is said to constitute Berliner's novelty. Upon the complainant's contention, the conception of transition resistance was one that was not essential to the development of a microphone transmitter. An immense amount of painstaking and highly ingenious experiment preceded Edison's successful result. The discovery of the availability of carbon was unquestionably invention, and it resulted in the "first practical success in the art." The difference between carbon and metal is a difference that has made the advance in the art. The actual uselessness of the Berliner transmitter, the limited character of the disclosures in the Berliner specification and of the experiments and discoveries of Berliner, and the independence of Edison's invention, prevent us from treating this patent as a document which disclosed to the world an idea from

which resulted a practical success. It is conceded that the Edison transmitter as apparatus is a very important invention. All the encomiums bestowed upon Berliner are based upon what has been accomplished by Edison's carbon transmitters. It is contrary to common sense and contrary to the spirit of the patent laws that the work of Edison should, by virtue of after-acquired knowledge of skilled experts, and by virtue of their use of the discoveries of Edison himself, be subordinated to the claims of Berliner's patent. I think that the defendants have established the proposition stated under the fourth defense:

"If Berliner had never experimented in telephony, that art in June, 1877, would have been precisely the same; and that art to-day would be precisely where it is,"

—As the result of the work of Edison. If the Berliner patent or the Berliner apparatus is to be treated as a practical embodiment or disclosure of a discovery, what is this discovery? That a variation of pressure like that which was adequate in the case of liquid transmitters to produce the variation of resistance was also adequate to produce a variation of resistance between solid metallic electrodes; or that such minute changes of pressure or contact as could be produced with metallic electrodes would cause Bell's process to be practiced upon the current. The patent, on its face, shows that Berliner claimed no novelty in the process performed upon the current, nor in the mode of operating upon the resistance of the circuit; that he disclaimed what counsel now claim for him,—a new mode of operation. The discoveries of Berliner were so limited that, upon summing up, counsel for the complainant say:

"We have, then, as the result of the proofs on the part of Mr. Berliner, that he not only had an inventive conception, but that he constructed a series of instruments to embody it, and that those instruments did transmit the quality of sound, and, when tested at the present time, demonstrate their own effectiveness to transmit speech."

The conception, however, when reduced to definite form, resulted in apparatus that was substantially the Reis apparatus. The fact that Berliner himself constructed this apparatus is of no consequence in determining the character or scope of the conception. This amounted to no more than a thought that old apparatus might be operated by Bell's method. The discovery was that the quality of sound could be transmitted, and that he "now and then thought he could make out the words of familiar sentences, but it was exceedingly faint." According to Berliner's own testimony, this was the limit of his discovery. These are the only microphonic facts that he discovered. The microphone was not the result of a conception, but of a discovery of facts. Berliner did not discover, nor did he state the principle of, the microphone; for, according to the evidence of the complainant, this principle is unknown, and, according to the evidence of the defendants, it is Bell's principle of variable contact produced by the pressure of sound waves. The discovery that any new or improved effect upon the current would result was not made by Berliner. As a discoverer of microphonic facts, he made no practical advance upon

Reis (126 U. S. 540, 541, 8 Sup. Ct. 785, 786, 31 L. Ed. 991, 992), and added little or nothing to what Edison had learned as to the capacity of the Reis apparatus. As a "conceiver," he conceived only what Edison had conceived and tried with similar results before him. Berliner did not conceive that solid electrodes would produce an effect such as was afterwards distinguished as a microphonic effect, and he did not discover any difference from the magneto transmitter in the effects on the current. Edison, by independent investigation, made discoveries of very great importance as to the effects produced with different materials in different adjustments, and made over the Reis transmitter into a practical speech transmitter. The subsequent or previous discovery that the old Reis transmitter could be made to perform the operation may be of scientific interest, but upon no principle of common sense can it be made to control and anticipate the solution of the practical problem by Edison's different experimental method. The utmost that Berliner can be entitled to is apparatus substantially like that disclosed in his patent, when used for the transmission of speech. So hopeless is the complainant's case, if Berliner's invention is to be considered merely an invention of apparatus for practicing Bell's method, that the complainant persistently ignores all comparison of Edison's and Berliner's transmitters in respect to practical utility, and insists that the test of infringement is comparison as to a method or process involved in the apparatus. It is clearly shown by the defendants that the Berliner patent does not disclose, and that Berliner did not invent, a new art or process. Upon what is the Berliner process or art practiced? Not upon the current; not upon the resistance of the circuit; for this is all disclaimed and is Bell's. Leaving out manufactures and compositions of matter, the patent law provides no middle ground between patents for an art and for a machine. Berliner's invention of "a new mode of operation" seems to be neither an art nor a machine, but an abstraction which may be described, in the language of Chief Justice Fuller, as "a disembodied shape in an intermediate state of ambiguous existence." See Westinghouse v. Brake Co., 170 U. S. 555, 556, 18 Sup. Ct. 707, 42 L. Ed. 1136. Having first in the patent and in the prima facie case claimed broadly the method of Bell's patent when practiced between opposing electrodes, and every form of constant-contact transmitter that it is possible to make, the complainant seeks to save its broad generalization by excepting from it various kinds of apparatus that come within its terms; but, after all these exceptions are made, the complainant's claims still have a scope to which they are not entitled. The generalization can be corrected only by the admission that the method of operation is Bell's method, and that it does not constitute a new method to construct a new kind of circuit or to make a new kind of variable resistance. As a matter of fact, the complainant's case on rebuttal shows a substantial departure from the contention that Berliner did invent a new art, process or method, and actually rests upon the proposition that the Berliner patent is to be construed as claiming and covering all telephonic apparatus having transition resistance. The new distinction introduced by the expert evidence as to transition resistance is an implied limitation as to apparatus. First claiming broadly all

electrodes, then, by arbitrary exception not found in the terms of the claims, limiting itself to solids to avoid Bell's liquid transmitter, it now limits the apparatus to electrodes having transition resistance in order to avoid Edison's solid electrodes. We should remember that the fundamental proposition of the complainant, upon which learned and astute counsel have deliberately based this very important case, is that Berliner's invention does not reside in the structure involved,—"not in mere parts of metal or other conducting material so placed in an electric circuit as to serve as electrodes, but in a mode of operation whereby the sound waves, by varying the pressure between these electrodes, vary the contact or joint between them." Transition resistance, however, does reside in the structure involved; and it is perfectly manifest that, assuming the existence of apparatus having transition resistance, the method of varying that resistance is the same as for varying any other kind of resistance, to wit, the method of Bell's patent, claim 4,—gradually increasing it and diminishing it by sound waves. Counsel say that the words "electric speaking telephone transmitter operated by sound waves" obviously bring in the mode of operation and the force which operates. This is an exposure of a fundamental fallacy in complainant's case, to wit, the claim that the making of a new kind of circuit or a new form of resistance makes a new method or art that includes a novel relation of sound waves to this new kind of resistance. Bell's art covers resistance of any kind, and only the new thing upon which his method of claim 4 is to be practiced is patentable after Bell. There is no shadow of invention in the use of the minute force of a sound wave to effect changes in a circuit after Bell and Edison. There is no shadow of invention in using sound waves upon an instrument for the transmission of sound, after Bell. Sound waves as the motive force, and electrical undulations conforming thereto, were factors in the problem given by Bell. Bell's patent covers sound waves brought into a new relation with an electric current, and also into relation with the resistance of a circuit, whatever its kind. The complainant could not stand for a moment upon the proposition that Berliner made any new discovery as to the force that a sound wave can exert upon a circuit. The only scope for invention, after Bell, is in the apparatus employed to obey his law. The vibrations of a diaphragm under the sound waves involve no novel elemental action not previously in Bell and Edison. The patent disclaims novelty in the process practiced upon the current. The form of undulations, not their character, is all that is claimed. It was a known fact that the Reis apparatus could control the electrodes so as to strengthen and weaken the contact; that the vibrations of a diaphragm were of sufficient force to accomplish all that Berliner described in his application; that is, to weaken the initial contact of electrodes down to the breaking point. In the Reis musical transmitter, as well as in Bell's liquid transmitter, was shown all that Berliner needed to learn as to the power of sound waves. Some confusion has arisen from the fact that it is proven that the Reis apparatus, or Berliner's, is like a tool which, at the pleasure of the operator, may be made to perform the breaking operation of Reis or the variable-pressure operation of Berliner.

The operator may turn the screws so that the contact will be broken, or so that it will be preserved, or he may drop his voice in order to preserve contact; but the patent covers no art or skill required to keep electrodes in constant contact, or if it does is not infringed in this respect. The "method" of claim 1, and which "characterizes" the instrument of claim 2, requires, as a condition precedent, electrodes in constant contact. Prof. Cross says, "Constancy of contact will not transmit speech;" and that the variable-pressure operation is impossible when there is no contact. If there is an art or method of preserving the contact of electrodes which, in view of the experience of Edison and Berliner, and the evidence of experts as to experiments with metal electrodes, seems not improbable, it is not the method or art set forth in claim 1, and should not be confused with it. The method is "by causing the sound waves to vary the pressure between electrodes in constant contact so as to strengthen and weaken the contact." The patent sets forth, as the only means of securing constant contact, a screw. The "causing" is accomplished by placing the apparatus where there are sound waves. This is a very different thing from Mr. Bell's "causing electrical undulations" as a method of transmitting sound, or of causing the resistance of a circuit to vary in accordance with sound waves. Berliner's solicitor has not succeeded in paralleling Bell's claim 5. The production or selection of sound waves is no part of a new art or process. When the exhibitor of the apparatus speaks, he is merely producing sound waves, which is no part of the method of causing them to produce electrical undulations of similar form. If he drops his voice so that it will be a weak force, he is merely producing sound waves appropriate to the particular form of apparatus. If he finds a weak voice coming through the air, that will answer. Dropping the voice to feeble tones is an equivalent to a turn of the screw which is set forth in the patent as the means of preserving the contact. No new art or method can be practiced in front of the diaphragm. Berliner's mode of operation cannot be brought in upon the sound waves. It is all determined by the structure of the instrument. If the art is to be practiced at the diaphragm, or if it is to be practiced in putting a suitable amount of transition resistance into the circuit, the patent is certainly bad, since it leaves this art or method to be discovered by experiment. Prof. Brackett truly says, "So far as the method of operation is concerned, there is no novelty over Bell." There is also no novelty in mode of operation over Edison, even assuming that there is a novelty in the kind of resistance operated upon. The fact is that the complainant's fundamental proposition that Berliner's invention resides in a new mode of operation is erroneous. Berliner's invention, assuming that he made one, does reside in and is limited by the structure involved, and amounts simply to a discovery of the capacity of a specific structure to obey Bell's law. Berliner was not the first to introduce transition resistance into a circuit. The complainant concedes that Berliner was not the first to make the apparatus which it terms a "microphone." The Reis apparatus is conceded to be a microphone, and to have such transition resistance that it is capable of transmitting speech. Reis' failure was due to

the fact that, in operating his machine, he put in so much transition resistance that he interrupted his current.

It is unjust to these defendants that this case should be tried upon the theory of transition resistance, or upon the German patent to Ludtge; but I am of the opinion that, even if Berliner's claims are to be interpreted in the light of expert evidence as covering all transmitters having transition resistance between electrodes, these claims are of excessive breadth, and go far beyond the scope of any conception or discovery of Berliner. If Berliner discovered that such transition resistance as existed ready to his hand in the Reis transmitter was capable of varying the current, this gave him no right to claim any and all apparatus having transition resistance. As he does not describe it, gives no specific directions as to the amount necessary, gives no evidence that he made any investigations in consequence of a conception of this character, his utmost claim to transition resistance is to such as was involved in the structure which he used, to wit, such transition resistance as is possessed by metal electrodes when properly adjusted. Prof. Cross says of the granules of the powder form transmitter, "The carbon employed is of such a character as to possess a high transition resistance at the contact points." The complainant cannot monopolize a resistance "possessed" by carbon.

It follows that the Berliner patent, if it is valid at all and discloses an invention, is nevertheless so limited that it does not include the defendants' devices. Claim 1 for a method is invalid. Counsel justly say of this claim, "We have claimed as a method the operation of the apparatus exhibited; nothing more." Counsel for defendants contend rightly, I think, that the so-called "method" is mere phraseology, and merely an indirect description of apparatus. They say:

"Why could not Mr. Hunnings have said, 'I claim the method of producing undulations in a circuit by causing the sound waves to vary the pressure upon the flexible wall of a cell containing carbon powder included within the circuit, and thereby increase and diminish the resistance of the circuit'?"

If, after Bell, the Berliner method claim is good, every inventor of a new form of transmitter may base upon the peculiar features of his apparatus a new method claim for a process involved in the operation of his apparatus. Berliner did not alter Bell's variable-resistance method by applying it to the Reis electrodes, which the supreme court said Bell had taught Van der Weyde how to use, and might himself have used instead of the apparatus which he adopted. 126 U. S. 540, 8 Sup. Ct. 778, 31 L. Ed. 991; Westinghouse v. Brake Co., 170 U. S. 537, 554–557, 18 Sup. Ct. 707, 42 L. Ed. 1136. Like the method of the patent, the mode of operation by variable pressure and the mode of operation by varying-transition resistance are merely indirect and abstract descriptions of a part of what occurs in the operation of particular apparatus. We may test the identity of meaning conveyed by these various expressions by giving a Reis apparatus to three practical electricians; by telling the first to operate it according to Bell's method; the second, according to the variable-pressure method; and the third, according to the varying transition resistance method. If these persons are sufficiently intelligent to comprehend what is meant

by these instructions, each will do exactly the same thing. If this cannot be done without further invention, then it seems that the Berliner patent is invalid for an insufficient specification. It is furthermore important to observe that no method was claimed until 1880, after two years' public use. For this reason alone, claim 1 is invalid. The patent, therefore, must stand, if at all, upon claim 2. Taken literally, it is anticipated by the Bell mercury transmitter, and by Edison's devices of February 9th and April 1st. The patent confines itself to metal for the pin or second electrode, and carbon was disclaimed. Construed from the specification, the disclaimer of carbon and the experience of the patentee, as detailed in his testimony, it covers only its described electrodes and their known equivalents. Carbon was not a known equivalent. This claim cannot cover all solid electrodes, because, after Bell's invention, the problem was not to find a new method, but to discover a better material than Bell's mercury electrode. The claim cannot cover all solid material, for solidity of contacting surface is not in and of itself enough to make an apparatus practical or commercial. In Edison Electric Light Co. v. United States Electric Lighting Co., 3 C. C. A. 83, 52 Fed. 308, it was said:

"The degree of difference between carbons that lasted one hour and carbons that lasted hundreds of hours seems to have been precisely the difference between failure and success, and the combination which first achieved the result 'long desired, sometimes sought, and never before attained,' is a patentable invention."

The decision of the supreme court in Incandescent Lamp Patent, 159 U. S. 465, 476, 16 Sup. Ct. 75, 79, 40 L. Ed. 221, 225, is exactly in point. There it was said:

"Under these circumstances, to hold that one who had discovered that a certain fibrous or textile material answered the required purpose should obtain the right to exclude everybody from the whole domain of fibrous and textile materials, and thereby shut out any further efforts to discover a better specimen of that class than the patentee had employed, would be an unwarranted extension of his monopoly, and operate rather to discourage than to promote invention."

In that case the patent was held void. Fibrous or textile material was "too indefinite to be the subject of a valid monopoly." In the present case we have not even an equal limitation, for claim 2 does not mention solid material for the electrodes, but simply electrodes in constant contact,—language broad enough to include various transmitters which are acknowledged not to be within the scope of Berliner's invention. I am, therefore, of the opinion, that, even if the complainant were able to prove that Berliner had in fact made an invention; that his application upon its face disclosed this invention; that he was lawfully entitled to make the amendments, and that his previous patent of 1880 did not exhaust the power of the commissioner to grant the patent in suit; and that he was not anticipated by Edison,—even after all this, well-established rules of law would require us to hold that claim 1 of this patent is void, and that claim 2 is either void, or so limited that it does not include the defendants' transmitters.

It has been impossible, in this opinion, to consider all the points of the very able arguments that have been presented, or all the important contentions that have arisen. The brief of the defendants has met the case of the complainant thoroughly and completely, and with very exceptional ability and commendable fairness has demonstrated, in my opinion, that the complainant's case rests upon a patent that should not have been granted, and which is void for error apparent upon the face of the records of the patent office; that, as a matter of fact, Berliner on June 4, 1877, the date of his application, had not made the discovery that speech could be transmitted with the apparatus of the patent in suit, and was at that time, and long after, like other unsuccessful experimenters, attempting to use a broken current. In addition to the fundamental defects in the complainant's title to the patent, it appears that the best argument that skilled experts and learned and ingenious counsel can base upon this patent is logically untenable and legally unsound. The bills will be dismissed.